## LONA O'QUINN AND OTHERS v. PATTIE LOONEY AND OTHERS.

January 26, 1953.

Record No. 4008.

Present, All the Justices.

The opinion states the case.

*S. H. Sutherland* and *George C. Sutherland,* for appellants.

*Combs, Combs & Street,* for appellees.

BUCHANAN, J., delivered the opinion of the court.

This suit and two others were brought to settle controversies among the widow and children of George Looney over his estate. The three causes were heard together and one decree entered deciding the issues. This appeal from that decree raises only the question as to who is entitled to certain haulage royalties under a coal-mining lease made by George Looney and wife, Lona O'Quinn and husband, and Lydia Fletcher and husband to E. L. Bailey, dated June 1, 1931.

George Looney was at the time of this lease the owner of between four and five hundred acres of coal-bearing land in Buchanan county. Prior to the lease he and his wife, Pattie Looney, had made the following deeds to three of their seven children:

(1) To Joseph Looney, a son, dated January 21, 1922, conveying 66.7 acres, "this being all of his part in the estate of George Looney;" (2) To Lydia Fletcher, a daughter, dated January 21, 1922, conveying 70.9 acres, "to be Lydia Fletcher part of the estate of George Looney;" (3) To Lona O'Quinn, a daughter, dated November 28, 1925, conveying a tract the acreage of which is not given (but stated to be 71 acres in the lease), excepting rights of way to remove coal owned by Looney and wife and granting to Mrs. O'Quinn a right of way over the grantors' lands for similar purposes. The deed states that "this conveyance is to be Lona O'Quinn's part of Geo. Looney and Patsey Looney estate."

Thereafter the deed of lease of June 1, 1931, was made by George Looney, Lona O'Quinn, Lydia Fletcher and their consorts. It demised separately described tracts of land as follows:

(a) The 71 acres conveyed to Lona O'Quinn by the deed of November 28, 1925; (b) the 70.9 acres conveyed to Lydia Fletcher by the deed of January 21, 1922; and three tracts owned by George Looney designated in the lease as (c) containing 64.8 acres net; (d) containing 100 acres, and (e) containing 254 acres.

The purpose of the lease was stated to be to mine and remove all the coal on said lands and on any other lands then owned or thereafter acquired by the lessee; and the lessee was given broad surface privileges, including the right to use so much of the surface as necessary or convenient for mining and removing the coal; the right to build necessary or convenient tipples, houses and other equipment, tramways, railroads and other roads; the right to use timber under twelve inches in diameter and the right to use the openings and ways on said lands for mining and removing the coal from other lands.

The lessee agreed to pay to the lessors a royalty of ten cents a ton for the coal mined, with a minimum royalty of $1,000 a year, to continue as long as the lessee mined coal from the said property.

The lessors also granted to the lessee the right to haul through and over the leased premises coal mined from any other lands owned or subsequently acquired by the lessee, for a consideration of one cent a ton; and after the coal on the leased premises was mined out, a minimum rental or royalty of $720 a year was to be paid to the lessors for said haulage rights, whether that much coal was hauled or not, but with a provision for crediting the minimum with the tonnage royalty.

After this lease was made George Looney and wife conveyed to their remaining three children and to the children of a deceased son parcels of his land embraced in the lease, but without any reference to the lease, by deeds as follows: (1) To Eva M. Fletcher, daughter, dated July 17, 1937, for 46.51 acres; (2) To Edna, Hassie, Ruth, Inez and Glema Looney, children of Ishmael Looney, a deceased son, dated July 17, 1937, for 119.5 acres; (3) To Maude Looney McFall, daughter, a tract of 92.8 acres and a tract of 63.8 acres, but charged with the support and maintenance of Louisa Looney, an afflicted daughter of the grantors. George Looney died intestate in February, 1945.

The lease aforesaid was for a term of fifty years, with privileges of renewal for a like period; but with the further

provision that it should terminate when all the workable and merchantable coal was taken from the premises and need for the rights of way and surface privileges had ceased. It is stated in appellants' brief, although not in the record, that the lessee mined out the top seam of coal on the leased premises and ceased mining thereon about 1940, and in 1941 began paying the one cent a ton haulage royalty. The mine superintendent of the lessee company, testifying in 1949, estimated that hauling over the leased premises would be finished in six years from that date, and said it was uncertain whether there were any other seams of coal on the leased premises that were mineable under the lease or any mineable coal on adjacent property to be thereafter transported over the leased premises.

As stated, this haulage royalty is the matter now in controversy. The appellants contend that it should be divided among the present owners of the land embraced in the lease in proportion to the quantity owned by each. The appellees (Maude McFall, Louisa Looney and Pattie Looney, the last named being the widow of George Looney, living with her two daughters on the McFall land, the home tract of George Looney), contend, and the court held, that it should be paid to the owners of the tracts over which the haulage rights are exercised.

The appellants argue that the lease contract made by George Looney, Lona O'Quinn and Lydia Fletcher was a joint or entire contract, and not severable. The trial court in a written opinion held that the "circumstances and the construction placed upon the lease by the parties fully justify the conclusion that the parties intended the lease to be several and not joint," as among the lessors, and by the decree appealed from ordered that these haulage royalties should be paid "to the owners of the land over which said rights are exercised in proportion to the amount of the burden imposed thereon, * * *." A commissioner was appointed to report to the court the lands over which said rights are being exercised and the share to which the owner of each tract is entitled in the money derived from said haulage rights since the death of George Looney.

Primarily the question of whether a contract is entire or severable is one of intention, and to ascertain the intention regard is to be had to the subject matter of the agreement, the situation of the parties and the object they had in view at the time and intended to accomplish. *Eschner* v. *Eschner,* 146 Va.

417, 422, 131 S. E. 800, 802; *Buchanan* v. *Buchanan,* 174 Va. 255, 278, 6 S. E. 2d 612, 622.

Such lease contract as the one involved here may very well be joint and entire as between the lessors and the lessee, but severable as among the lessors themselves, depending upon their intention. If the intent is expressed in the writing, it of course controls; if not, it is to be discovered with the aids referred to in the *Eschner Case* as well as by the practical construction given the contract by the parties themselves.

When the terms of an agreement are doubtful or uncertain, the interpretation placed thereon by the parties themselves is entitled to great weight and will be followed if that may be done without violating applicable legal principles. *Kiser* v. *Amal. Clothing Workers,* 169 Va. 574, 591, 194 S. E. 727, 734; *First Nat. Bank* v. *Roanoke Oil Co.,* 169 Va. 99, 115, 192 S. E. 764, 771; 4 Mich. Jur., Contracts, § 47, p. 388.

The problem has often arisen with respect to oil and gas leases, where the vagrant and fugitive character of those substances has obviously influenced decisions and led to conflicting holdings as to whether joint lessors are entitled to share in the rents or royalties realized from any part of the combined tracts, or whether each lessor is limited to the rents or royalties accrued from his own tract. Many of the cases are collected in annotations in 5 A.L.R. 1162, 16 A.L.R. 588, 64 A.L.R. 634 and 116 A.L.R. 1267.

In the annotation in 116 A.L.R. at page 1268 it is said that most decisions have turned upon what the court has determined that the joint lessors intended, the result being arrived at through consideration of the provisions of the lease, the circumstances surrounding its execution, and the interpretation placed thereon by the joint lessors themselves, subsequent to its execution. See *United Gas Public Service Co.* v. *Eaton,* (La. App.), 153 So. 702; *Garza* v. *De Montalvo,* 147 Tex. 525, 217 S. W. 2d 988.

The reasoning with respect to oil and gas leases does not necessarily apply to coal leases which involve a substance that is neither vagrant nor fugitive, but fixed and stable component of the land capable of ascertainment and measurement. Here the question is as to the distribution of the haulage royalty paid and to be paid under the coal lease contract of 1931, and we

limit this decision to that question without choosing between the holdings with respect to oil and gas leases.

■ The lease itself does not deal with the division of the royalty either for the coal to be mined from or the coal to be hauled over the different tracts. The leased premises were composed of different tracts, separately owned and separately described. The Lona O'Quinn tract contained 71 acres; the Lydia Fletcher tract contained 70.9 acres, but the three George Looney tracts added up to 418.8 acres.*

Both the O'Quinn deed and the Fletcher deed recited that the land conveyed was to be the share of each in the estate of her father. This, together with the fact that the area contributed by the father was nearly six times the area contributed by each daughter, readily indicates that some agreement or understanding, apart from the lease, existed as among the lessors with respect to the division of the money. What that agreement was the lease contract does not show and does not undertake to deal with. As between the lessors and the lessee, no ambiguity has been pointed out which calls for any explanation beyond that found in the lease itself. But this controversy is among the lessors and on a point with which the lease does not deal. In that situation it is not only proper but necessary to look to the acts and conduct of the parties, to what was done and said by them, in order to determine what agreement was made as to the distribution of the royalties. *Rymer* v. *South Penn Oil Co.*, 54 W. Va. 530, 46 S. E. 559.

■ The trial court in its opinion said, "the parties to this lease have treated the lease as several. The royalties for the coal mined on each tract have been paid to and received by the owners of the respective tracts, from which the coal was taken. There is not even any contention in this case that the lease is joint with respect to the coal mined." That statement is in accord with the evidence and the record.

The bill filed in the first suit, instituted in 1947, which began this litigation, was brought by Lona O'Quinn, Joseph Looney and Eva Reynolds, of the appellants, as well as by Pattie Looney, Maude McFall and Louisa Looney, the appellees. It was against

---

* Appellants' reply brief states that 418.8 acres is the total leased by all the lessors, and that only 276.8 acres belonged to George Looney. This, however, does not appear from the record and the acreage in the three deeds made after the lease totals 322.71 acres.

Thomas Fletcher, the surviving husband of Lydia Fletcher, and the infant children of Ishmael Looney. Its main purpose was to determine the interest of Thomas Fletcher in the coal and timber on his wife's land and to compel him to endorse checks for the haulage royalty, which after the death of Lydia Fletcher and George Looney continued to be made payable to all the lessors.

This bill alleged that the assignee of the original lease had done extensive mining on the lands of said lessors and "it sent its checks to said lessors for the coal mined on their respective lands, each quarter; but the coal from other lands that was hauled over the lands of said lessors at the price of one cent per ton or the amount so paid for this easement right was sent in one check each quarter to the said George Looney, as he owned most of the lands through and over which said hauling rights, or easement rights, extended; * * *."

This bill further alleged that each quarter George Looney would give Lydia Fletcher whatever amount he thought she ought to have, but never more than about $50, "and it was always satisfactory to her."

The bill further alleged that "during the lifetime of the said Lydia Fletcher, George Looney never did give Lona O'Quinn any of said right of way money, but Lona O'Quinn made no objections thereto, as her father had given her the land she owned, and she got the royalty on the coal on it, and she made no protest or claim to any of this right of way money, unless her said father just wanted to give her some of it, * * *."

It was further alleged in the bill that the haulage rights exercised by the lessee, as well as most of the mining structures, were over and on the 92-acre tract had been conveyed to Maude McFall, "and it is her contention that she should have most of the right of way money or money paid for easement rights, and haul rights, as her land is damaged by smoke, noise and otherwise, more than any other lands included in said lease."

The evidence shows that the haulage rights are being exercised exclusively over the Maude McFall 92-acre tract and the Lydia Fletcher 70-acre tract; that on the McFall tract are 4900 feet of railroad, mining and supply tracks, as well as tipples, a shop, supply house and other buildings and equipment used in connection with the transportation of the coal; and that on the Fletcher tract there are 1400 feet of tracks as well as a small substation building.

Some effort was made by Lona O'Quinn, by a subsequent pleading called an answer and cross-bill, which appears not to have actually been filed, joined in by Joseph Looney, Eva Reynolds and the children of Ishmael Looney, and by her evidence, to explain away the allegations and statements of fact in her original bill; but it cannot be said that she succeeded in doing more than raising some conflict in the evidence, insufficient to nullify the statements of her bill. She testified that she got none of the haulage royalties until 1941, after which she got $100 out of every check; but she admitted that the last haulage money her father gave her was more than a year before he died and she stated that anything he gave her was satisfactory to her. Neither she nor any other of the children made any claim to these royalties when the personal estate of George Looney was settled by his administratix. Notwithstanding the provision in her deed that the land conveyed was to be all of her share, there was paid to her and she accepted $901.88 as her part of his personal estate, as did Joseph Looney, another of appellants, in whose deed was a similar provision.

There was evidence to the effect that George Looney was particularly concerned about the welfare of his wife and their afflicted daughter, and intended and believed that the deed he made to Maude McFall conveyed the haulage royalty. His widow testified that he told her he did that so "you will have plenty to live on without working so hard." On cross-examination she said "he helped his children and they all have good homes, and what he left there, he said he left it for me and Maude and Louisa, and there isn't a lump of coal comes over none of their land, and it comes down near our door, and took nearly all my garden."

The record fully supports this conclusion of the trial court: "There was no division of the royalties from the haulage rights in proportion to the acreage of the respective owners during the lifetime of George Looney although George Looney did pay to the other owners some of the royalties. The right to do what he wanted to with the haulage royalties which went over the land owned by him, and now owned by Maude Looney McFall, was never questioned as long as he lived."

It is evident that the parties understood that the haulage royalties would be distributed on the same basis as the coal

royalties, each owner to be paid for what his own tract contributed.

It is indicated in the record that there is a possibility that coal from other seams may be mined and hauled over the leased premises. The decree appealed from is held to mean, and the decree to be entered on the commissioner's report shall provide, that the owner of any part of the leased premises over whose land the haulage rights are hereafter exercised shall be paid a part of the haulage royalty in proportion to the amount of the burden imposed on his land.

The decree below is

*Affirmed.*