Present:  All the Justices

JOHN C. DONNELLY, ETC.

                                        OPINION BY
v.  Record No. 982204      CHIEF JUSTICE HARRY L. CARRICO
                                    September 17, 1999

DONATELLI & KLEIN,
INCORPORATED, ET AL.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Gerald Bruce Lee, Judge

This appeal involves the Plaza 500 Limited Partnership (the Partnership), which was formed in 1987 for the purpose of owning, developing, leasing, and otherwise dealing with a 34-acre tract of land improved with approximately 500,000 square feet of office/warehouse facilities in Fairfax County.  At the time the Partnership was formed, it was composed of Donnelly-McKnight, Inc. (Donnelly-McKnight) and Donatelli & Klein, Incorporated (Donatelli & Klein) as general partners and John C. Donnelly (Donnelly), William H. McKnight (McKnight), Louis T. Donatelli (Donatelli), William M. Harvey (Harvey), and DKEPA #7, a Maryland general partnership, as limited partners.[1]

Plaza 500 was the fifth partnership created by Donnelly-McKnight and Donatelli & Klein to acquire and develop commercial real estate.  Beginning in the mid-1980s, Donnelly and McKnight, both real estate appraisers,

_____

[1] Wilson Brothers, Incorporated later became a limited partner.

would locate an undervalued property and join with Donatelli and his firm, Donatelli & Klein, in forming a partnership to own and manage the property.  Donnelly and McKnight contributed the equity in the property and Donatelli provided the financial backing in the form of his financial guaranty.

The arrangement among the parties with respect to Plaza 500 is the subject of a limited partnership agreement (the Agreement) dated October 22, 1987.  Section 9 of the Agreement is styled "Legal Title to Partnership Property; Power of General Partners; Indemnities."  In pertinent part, Paragraph B of Section 9 provides as follows:

> The general partners, acting in their capacity as general partners for and on behalf of the Partnership, and subject to Section 10 hereof, shall have the right, power and authority . . . to manage, lease, sell, mortgage, convey, improve, alter, renovate, refinance, grant easements on or dedicate the property of the Partnership . . . .  All decisions, including the time and amounts of cash calls, shall be made by the unanimous vote of the general partners.

Paragraph C of Section 9 pertains to "any party dealing with the general partners with respect to any property of the Partnership."  Paragraph C provides in pertinent part as follows:

> Subject to the provisions of Section 10 hereof, every contract, agreement, deed, mortgage, lease, promissory note or other instrument or document executed by the general partners with respect to any property of the Partnership shall be conclusive evidence in favor of

2

any person relying thereon or claiming thereunder that . . . the general partners were duly authorized and empowered to execute and deliver such instrument or document for and on behalf of the Partnership. Notwithstanding the foregoing, either of the general partners may execute a contract, agreement, deed, mortgage, lease, promissory note or other instrument or document on behalf of the Partnership, and such execution shall be deemed to bind the Partnership, provided that such execution has been specifically authorized pursuant to a written consent or resolution joined by both general partners.

Section 10 of the Agreement, to which both Paragraphs B and C of Section 9 are subject, is styled "Management of Business."  Paragraph A of Section 10 provides in pertinent part as follows:

All decisions in the management of the business, affairs and assets of the Partnership shall be made by the general partners by unanimous vote of the general partners.  No limited partner . . . shall have or exercise any rights in connection with the management of the Partnership business.  In the event of any disagreement between the general partners as to any matter, which continues after consultation between the general partners, general partner Donatelli & Klein, Incorporated shall determine the matter in dispute in its sole discretion.

(Emphasis added.)

The italicized language, referred to by the parties as a "tie-breaker provision," was included in the Agreement upon Donatelli's insistence.  In a meeting held before the Agreement was executed, with Donatelli, Donnelly, McKnight, and Harvey in attendance, Donatelli stated that "he wanted to control the partnership and have decision-making power."

Donnelly and McKnight said they "did not want that."  The "resolution [of the question] is contained in the partnership agreement."

The effect of the tie-breaker provision is the crucial issue in the present litigation, which began on July 3, 1997, when Donnelly, in his role as a limited partner, filed a bill of complaint derivatively on behalf of the Partnership.  Named as parties defendant were Donatelli & Klein, Donatelli, his wife, Ann K. Donatelli, and D&K Management, Inc. (D&K Management)[2] (collectively, the Donatelli Parties), as well as Donnelly-McKnight,[3] McKnight, Harvey, Wilson Brothers, Incorporated, and DKEPA #7.

In his bill of complaint, Donnelly asserted against the Donatelli Parties claims of breach of contract, breach of fiduciary duty, tortious conversion, and conspiracy. Donnelly alleged that the Donatelli Parties had charged excessive fees for various services rendered to the Partnership.  Donnelly prayed for the return of the excess amounts to the Partnership, an accounting, a declaratory judgment, an injunction removing Donatelli & Klein as a

---

[2] D&K Management is owned and operated by Louis T. Donatelli, his wife, Ann K. Donatelli, and his son, Douglas J. Donatelli.

[3] Although a defendant below and an appellee here, Donnelly-McKnight, Inc. adopts the opening brief of the appellant, John C. Donnelly.

4

general partner and prohibiting the Donatelli Parties from making further payments to themselves, and the appointment of a receiver to manage the affairs of the Partnership during the pendency of the litigation.

In September 1997, while Donnelly's bill of complaint was pending, Donatelli & Klein informed Donnelly and Donnelly-McKnight of an opportunity to refinance on more reasonable terms the existing encumbrance on the Plaza 500 property. Donatelli & Klein sought the approval of Donnelly and Donnelly-McKnight to a refinancing of the Plaza 500 property with a new lender in conjunction with a proposal to contribute that property and other commercial properties to the formation of an umbrella property real estate investment trust (UPREIT) in return for the issuance of units of limited partnership interest. Donatelli & Klein consulted with Donnelly and Donnelly-McKnight "on numerous occasions" concerning the proposal for refinancing of the existing encumbrance and the creation of an UPREIT. However, in a letter to Donatelli & Klein's counsel dated September 23, 1997, Donnelly voiced objection to the proposal.

In December 1997, Donatelli & Klein entered into a transaction involving a number of entities it created,

referred to by the parties as "the FPR Entities."[4]  As part of this transaction, Donatelli & Klein conveyed the Plaza 500 property by special warranty deed to FPR Holdings Limited Partnership (FPR Holdings).  In return, the Partnership received partnership units in First Potomac Realty Investment Limited Partnership.  This latter organization owns related entities and through such ownership controls four commercial properties, including Plaza 500.

The Plaza 500 property and the three other commercial properties were used as collateral for a portion of a loan of approximately $58 million made to the FPR Entities by Credit Suisse First Boston Mortgage Capital, L.L.C. (Credit Suisse).  Of the amount loaned, $32,175,000.00 encumbered the Plaza 500 property in a cross-collaterization with the other properties covered by the $58 million loan.  In connection with the loan, FPR Holdings executed a credit line deed of trust, an assignment, and a pledge agreement.

By letter dated January 8, 1998, Donatelli & Klein notified the Plaza 500 partners that the Partnership's property had been conveyed to FPR Holdings.  Donnelly then

---

[4] The FPR Entities include First Potomac Realty Investment Limited Partnership, First Potomac Realty Investment Trust, Inc., FPR Realty Limited Partnership, FPR – GP Realty,

filed an amended bill of complaint and a second amended bill of complaint.  He also sought a preliminary injunction restraining Donatelli & Klein from any further efforts to convey the Plaza 500 property to the FPR Entities.  The chancellor denied the injunction, but in a "Stipulation and Order" approved by the chancellor on February 12, 1998, Donatelli & Klein agreed that it would "exercise no authority as general partner of Plaza 500 Limited Partnership . . . without the express approval of Defendant Donnelly-McKnight, Inc. . . . as general partner of Plaza 500" and that "[t]he status quo [would] be maintained pending trial or further order of [the] Court."

In his second amended bill of complaint, Donnelly added the FPR Entities as defendants, as well as Credit Suisse and several other parties.  Donnelly also added a count in rescission and prayed that the conveyance by Donatelli & Klein to FPR Holdings and the Credit Suisse deed of trust, assignment, and pledge agreement be held void "for lack of authority and/or because such conveyances are fraudulent."

Hence, the proceedings below involved two separate claims:  first, that the Donatelli Parties had charged

Inc., FPR Holdings Limited Partnership, and FPR – GP Holdings, Inc.

excessive fees for services rendered to the Partnership, and, second, that the Donatelli & Klein conveyance to FPR Holdings was unauthorized and should be rescinded.

With respect to the first claim, the chancellor found that certain of the fees charged by the Donatelli Parties were excessive or unauthorized. The chancellor held against Donatelli & Klein for breach of the Agreement, breach of fiduciary duty, and tortious conversion, against Donatelli for breach of fiduciary duty, and against Donatelli, his wife, Ann, and D&K Management for tortious conversion. In his final decree, the chancellor entered judgment in favor of Donnelly, derivatively on behalf of the Partnership, against Donatelli & Klein and D&K Management, jointly and severally, in the amount of $546,962.00 plus prejudgment interest. Of that amount, a judgment for $304,922.00 plus prejudgment interest was also entered against Donatelli and his wife, Ann, jointly and severally. The chancellor decreed further that Donatelli and his wife should return to the Partnership units of First Potomac Realty Investment Limited Partnership with an assigned value of $744,000.00 and that a $900,000.00 leasing commission charged by the Donatelli Parties associated with the renewal of a lease was not to be charged against the Partnership or the FPR Entities. The

record shows that the monetary judgments have been paid and released and that the $744,000.00 units in First Potomac Realty Investment Limited Partnership have been returned to the Partnership.  No issue has been raised on appeal concerning these matters.

With respect to the claim for rescission, the chancellor first found that the language of Sections 9 and 10 of the Agreement was unambiguous and, accordingly, that the language should be construed according to "the plain meaning" rule.  See Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983).  The chancellor then proceeded to hold as a matter of law that the conveyance of the Plaza 500 property by Donatelli & Klein to FPR Holdings "was authorized by the . . . Agreement" and was "valid," that the cross-collaterization of the Credit Suisse loan was "valid and enforceable," and that the Credit Suisse deed of trust, assignment, and pledge agreement were "authorized under the . . . Agreement and enforceable."  Accordingly, the chancellor held in favor of "the 'Donatelli Defendants'" on the counts of the second amended bill of complaint involving conspiracy and in favor of "the 'Donatelli Defendants,'" "the 'FPR Defendants,'" and Credit Suisse on the counts involving rescission, removal of Donatelli & Klein as a general partner, and the appointment

9

of a receiver.[5]  We awarded Donnelly this appeal to review the chancellor's action concerning the claim for rescission.

On appeal, Donnelly stresses the heading of Section 9 of the Agreement, "Legal Title to Partnership Property; Power of General Partners; Indemnities."  Donnelly also quotes Section 9(B)'s language granting the general partners power to "manage, lease, sell, mortgage, convey, improve, alter, renovate, refinance, grant easements on or dedicate the property of the Partnership."  Donnelly then quotes the admonition contained in Section 9(B) that "[a]ll decisions, including the time and amounts of cash calls, shall be made by the unanimous vote of the general partners."

Next, Donnelly cites Section 9(C) and states that it "describes the binding authority of the general partners to execute documents" in favor of third parties.  Donnelly accents the last sentence of Section 9(C), which provides that "[n]otwithstanding the foregoing, either of the general partners may execute [documents in favor of third parties] and such execution shall be deemed to bind the

---

[5] The chancellor awarded Donnelly "a limited accounting" to ensure compliance with the provision of the final decree relating to the return of the units in First Potomac Realty

Partnership, provided that such execution has been specifically authorized pursuant to a written consent or resolution joined by both general partners."

Finally, Donnelly recognizes the existence of Section 10(A), which provides that in the event of disagreement between the general partners which continues after consultation between them, Donatelli & Klein "shall determine the matter in dispute in its sole discretion." Donnelly emphasizes, however, that Section 10 is headed "Management of Business."

From the foregoing, Donnelly argues that "the only reasonable construction of Paragraph 10.A., which is referenced in paragraphs 9.B. and 9.C., is that it applies merely to day-to-day management of the partnership business and not to fundamental decisions like leasing, refinancing and conveying the property." Donnelly also argues that Sections 9(B) and 9(C) are made subject to Section 10 "merely to clarify that as to day-to-day management of the business, [Donatelli & Klein] could exercise discretion after consultation with Donnelly-McKnight, notwithstanding the language in paragraph 9 that otherwise requires unanimous consent of both general partners."

---

Investment Limited Partnership.  As noted previously in the text, the return of the units has been accomplished.

11

Donnelly correctly states that it is a question of law subject to de novo review whether the chancellor properly found the language of Sections 9 and 10 to be unambiguous. See Gordonsville Energy, L.P. v. Virginia Elec. & Power Co., 257 Va. 344, 352-53, 512 S.E.2d 811, 816 (1999); Tuomala v. Regent University, 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996). Donnelly is also correct in saying that we are not bound by the chancellor's construction of the contractual provisions and that we are presented the same opportunity as the chancellor to consider the provisions. Id. However, after giving the chancellor's finding de novo review and considering the contractual provisions on our own, we affirm the chancellor's finding.

Section 10 is labeled "Management of Business," not "Day-to-Day Management of Business," as Donnelly would have us read the heading. And, while labels may be helpful in determining contractual intent, they are not controlling. See Commonwealth v. E. W. Yeatts, Inc., 233 Va. 17, 24, 353 S.E.2d 717, 721 (1987) (divining legislative intent not contest of labels but exercise in common sense interpretation of statutory language).

Furthermore, the content of Section 10 is much more expansive than its heading. By its terms, Section 10 encompasses decisions related not only to the management of

12

the business but also to the management of the "affairs and assets of the Partnership," and the authority granted Donatelli & Klein to make a decision in its sole discretion after consultation with Donnelly-McKnight extends to "any disagreement . . . as to any matter."  (Emphasis added.) The parties could not have made their intention more explicit.  We agree with the chancellor, therefore, in his conclusion that Section 10(A) conferred power upon Donatelli & Klein to determine, in its sole discretion and after consultation with Donnelly-McKnight, the dispute concerning the refinancing of Plaza 500 and the conveyance of the Partnership assets to FPR Holdings.

Donnelly argues, however, that in attempting to reconcile the apparent conflict between Sections 9 and 10 of the Agreement, the chancellor failed to apply well-recognized rules of contract construction.  In this connection, Donnelly cites Bott v. N. Snellenburg & Co., 177 Va. 331, 14 S.E.2d 372 (1941), for the rule that "'where there is a repugnancy, a general provision in a contract must give way to a special one covering the same ground.'"  Id. at 339, 14 S.E.2d at 375 (quoting Harrity v. Continental-Equitable Title & Trust Co., 124 A. 493, 495 (Pa. 1924)).

There are several difficulties with this argument. First, we do not agree there is conflict between Sections 9 and 10. Paragraphs A and B, the pertinent paragraphs of Section 9, are both made subject to Section 10; "subject to" means "subordinate, subservient, inferior, obedient to; governed or affected by." Black's Law Dictionary 1425 (6th ed. 1990). This, alone, obviates any possibility of conflict between Sections 9 and 10.

Second, Section 9 is operative when the general partners are in agreement on a given matter while the part of Section 10 that gives Donatelli & Klein authority to act alone is operative only when the general partners disagree. Hence, with Sections 9 and 10 operating within their respective spheres, they do not cover the same ground and there is no basis for conflict.

Third, Donnelly is mistaken about what is general and what is specific. The provisions in Paragraphs A and B of Section 9 are general in nature while the provision in Section 10 giving Donatelli & Klein sole discretion to act is specific, confined to the one situation where the general partners disagree following consultation between them. Hence, the general provisions of Section 9 must give way to the specific provision of Section 10.

What has been said should be sufficient to answer Donnelly's next argument, viz., the chancellor failed to observe the rule enunciated in Berry that "[t]he court must give effect to all of the language of a contract if its parts can be read together without conflict [and, where] possible, meaning must be given to every clause."  225 Va. at 208, 300 S.E.2d at 796.  As we have just demonstrated, Sections 9 and 10 can be read together without conflict and meaning can be given to both sections when permitted to operate within their respective spheres.  We thus give effect to all the language of Sections 9 and 10.

Donnelly also notes that in determining Donatelli & Klein had "authority to convey the Partnership Property without Donnelly-McKnight's consent, the Chancellor relied on the 'plain meaning rule' emphasizing the use of the words 'subject to' where paragraphs 9.B. and 9.C. reference paragraph 10.A."  However, Donnelly complains, the chancellor "did not apply the same [rule] when considering the last provision of paragraph 9.C."  That provision, with Donnelly's emphasis added, states as follows:

> **Notwithstanding the foregoing**, **either of the general partners** may execute a contract, agreement, **deed**, mortgage, lease, promissory note or other instrument or document on behalf of the Partnership, and such execution shall be deemed to bind the Partnership, **provided that such execution has been specifically**

15

**authorized pursuant to a written consent or resolution joined by both general partners**.

This, Donnelly says, "is a clear statement of what is required for one general partner to execute deeds and mortgages on behalf of the Partnership," <u>viz.</u>, "a joint resolution of both general partners or a written consent of Donnelly-McKnight."

This argument, however, overlooks the fact, as discussed above, that the Agreement provides two separate spheres of operation for decisions of the general partners, one where the general partners agree and the other where they disagree. The applicability of the "[n]otwithstanding" provision of Section 9(C) obviously is predicated upon the existence of an agreement — it speaks only in terms of consent and joint resolution — a situation that does not prevail here.

Furthermore, the provision clearly is for the protection of third parties who deal with the Partnership and not the partners themselves. Section 9(C) is directed to "any party dealing with the general partners with respect to any property of the Partnership," and the interests of third parties are not at issue in this appeal.

Finally, it bears repeating that Section 9(C) is expressly made "[s]ubject to the provisions of Section 10."

Donnelly argues, however, that because the "[s]ubject to" language precedes the "[n]othwithstanding" clause in Section 9(C), the latter nullifies the former and eliminates Section 10 from consideration. But this interpretation would have the effect of making the "[n]otwithstanding" clause read "[n]otwithstanding the provisions of Section 10," and that, in our opinion, would be an impermissible reading. Rather, we think the "[n]otwithstanding" clause, which envisions the situation where a formal document has been executed by one general partner, was intended to apply only to the language immediately preceding it in Section 9(C), which envisions the situation where a formal document has been executed by both general partners.

Donnelly argues further that because the provision in Section 10(A) concerning the determination of disputed matters was included in the Agreement upon Donatelli's insistence, the provision must be strictly construed against Donatelli & Klein as though it was the draftsman. Donnelly cites <u>Martin & Martin, Inc. v. Bradley Enterprises</u>, 256 Va. 288, 504 S.E.2d 849 (1998), in support of his argument. However, as stated in <u>Martin</u>, the rule is that "[i]n the event of an ambiguity in the written contract, such ambiguity must be construed against the

17

drafter of the agreement." Id. at 291, 504 S.E.2d at 851 (emphasis added). Here, the chancellor found there was no ambiguity in the Section 10(A) provision, and we agree, so the Martin rule does not apply. In any event, we find that a strict construction of the provision would not produce a different result.

Donnelly next argues that "the transfer of Plaza 500's Property to the entities created by Donatelli for the purported purpose of forming a real estate investment trust also constitutes a change in the business of the partnership which, pursuant to paragraph 17.F.(1)(v) required the unanimous consent of all of the partners, general and limited." However, we fail to see how Section 17(F) benefits Donnelly.

In pertinent part, Section 17(F) provides as follows:

Each limited partner . . . does hereby appoint [the general partners], either of whom may act alone, as . . . attorneys-in-fact, in such limited partner's name and behalf, to prepare an amendment to this Agreement and to sign . . . and acknowledge any and every such amendment . . ., where such an amendment is necessary to reflect any of the following:

. . . .

(v) a change in the character of the business of the Partnership by unanimous written consent of all partners[.]

Rather than requiring the unanimous written consent of all the partners themselves, Section 17(F) permits a general

18

partner, acting alone, to provide the written consent of the limited partners. This is the sort of conduct by a general partner, acting alone, that Donnelly abjures.

As noted previously, the chancellor found that the language of Sections 9 and 10 of the Agreement was not ambiguous, yet he permitted the parties to introduce an abundance of parol evidence in the form of oral testimony and numerous exhibits. Neither party has assigned error to the admission of the parol evidence and each relies upon different parts of it in the arguments.

Donnelly says that the parol evidence "overwhelmingly corroborates [his] interpretation of [the] Partnership Agreement." We disagree with Donnelly. At best, from Donnelly's standpoint, the parol evidence produces a standoff.

Donnelly presented the testimony of himself, McKnight, and Harvey. Donnelly testified concerning one instance when he was asked at "the last hour" by Donatelli & Klein to sign a lease, with the explanation that it was "extremely important [to] get a signed lease" immediately or run the risk of losing the business opportunity.

McKnight testified concerning the effect of the change that was made upon Donatelli's insistence to include the tie-breaker provision in the Agreement.

McKnight said it was his understanding that "Donatelli & Klein would have discretion, after consultation with [Donnelly-McKnight], if we couldn't agree on day-to-day management issues, to make the decision." When asked "how one partner can bind the other partner in terms of signing deeds and things of that nature," McKnight responded by referring to the "[n]otwithstanding the foregoing" provision of Section 9(C) of the Agreement, which relates to the authority of one general partner to execute deeds and other formal papers "provided that such execution has been specifically authorized pursuant to a written consent or resolution joined by both general partners."

Harvey testified it was his understanding of "Donatelli's decision-making role" that "Donatelli would consult with Mr. Donnelly and Mr. McKnight, and if they couldn't agree, then Mr. Donatelli would have final decision-making authority on all operating issues." By "operating issues," Harvey said he meant "[m]anagement of the property, contracts, those types of things . . . but as to refinancing and sale, . . . it would take the concurrence of both the Donatelli side and the Donnelly-McKnight side."

Donnelly also introduced fifty-five contracts, leases, and other documents, including a "CONSENT" given to a potential lender, that had been signed by both Donatelli & Klein and Donnelly-McKnight over a ten-year period. According to Donnelly, in these exhibits, the parties evidenced by their own practice that both Donatelli & Klein and Donnelly-McKnight "were required to sign all such contracts, leases and mortgages and any other documents affecting title to the Plaza 500 Property."

Further, Donnelly asserts that the Donatelli Parties "admitted at trial that, until they secretly conveyed away the Partnership's property in December 1997, they can recall no other instances in the ten years of the Partnership's existence, where [Donatelli & Klein] signed any leases, deeds, or mortgages without the approval and consent in writing of Donnelly-McKnight." However, it is worthy of note that Donnelly points to no evidence in the record of any disagreement between the general partners concerning any leases, deeds, or mortgages in the ten-year existence of the Partnership until the advent of the current refinancing/UPREIT dispute in 1997.

In his turn, Donatelli testified it was his understanding that, under the terms of the Agreement, he had "the last word." In addition, Donatelli introduced

into evidence a series of letters Donnelly or his counsel addressed to Donatelli over a period of some two years, with the purpose of securing an amendment to Section 10(A)'s provision granting power to Donatelli & Klein to determine disputed matters in its sole discretion. The chancellor specifically noted two of the letters in the course of his oral opinion upholding the power of control granted Donatelli & Klein by Section 10(A). Dated March 29, 1993, the first letter stated as follows:

> Paragraph 10 A of the partnership agreement for Plaza 500, provides that all decisions as to the management of the business, affairs and assets of Plaza 500 are to be made by unanimous vote of the general partners, but that Donatelli & Klein, Incorporated shall have the right to resolve any dispute arising between the general partners which continue after consultation. This provision is of concern to me, and I believe it affects you and your heirs as well.

> In the event a trustee is appointed by a bank or court to hold your partnership interest, Paragraph 10 A may permit such an individual to make decisions with respect to the property which would affect both our interests. . . .

> I am therefore requesting that you agree, by signing the enclosed copy of this letter, not to exercise the authority purported to be granted to Donatelli & Klein in Paragraph 10 A, and that . . . you will not make any decision in the management of the business, affairs, or assets of Plaza 500 without obtaining my consent or that of Donnelly-McKnight . . . .

(Emphasis added.) The second letter, dated April 19, 1993, stated as follows:

22

I wrote to you on March 29, 1993 pertaining to revisions to Paragraph 10A of the partnership agreement for Plaza 500. . . .

You have indicated today that you are too busy to address the revisions.  Accordingly, I have.

Paragraph 10A will, effective immediately, be revised to read (pertaining to decision making capacities):

It is hereby agreed that neither Donatelli & Klein, Incorporated, nor its successors or assigns, shall make any decisions in the management of the business affairs and assets of Plaza 500 Limited Partnership without obtaining the consent of John C. Donnelly & Donnelly-McKnight, Inc.

Donnelly did not identify the source of his purported authority to revise the Agreement ex parte.  Be that as it may, these letters, as the chancellor observed, "revealed that [Donnelly] was well aware that [Donatelli & Klein] had the right to resolve any dispute arising between the general partners which continues after consultation."

The final letter in the series is also revealing on Donnelly's awareness that Donatelli & Klein's power to resolve disputed matters was not limited to day-to-day management of the Partnership's business.  Dated March 6, 1995, the letter was written from Donnelly's counsel to Donatelli, and it listed eight matters Donnelly "would like to have addressed" concerning the Partnership.  The eighth matter was stated as follows: "Donatelli & Klein, Inc. shall consult with Donnelly-McKnight, Inc. as to all

23

partnership decisions.  In the event of a disagreement, there should be a provision for arbitration between the partners, the cost of which would be paid by the partnership."  (Emphasis added.)

Hence, if there remains any doubt or uncertainty about the extent of the power granted to Donatelli & Klein by Section 10(A), "the interpretation placed thereon by the parties themselves is entitled to great weight and will be followed if that may be done without violating applicable legal principles."  Dart Drug Corp. v. Nicholakos, 221 Va. 989, 995, 277 S.E.2d 155, 158 (1981) (quoting O'Quinn v. Looney, 194 Va. 548, 552, 74 S.E.2d 157, 159 (1953)). Donnelly has not cited any legal principle the chancellor violated in giving great weight to the interpretation Donnelly placed upon Section 10(A) in his letters to Donatelli & Klein.

Donnelly's remaining arguments turn on whether Donatelli & Klein had the authority to make the conveyance of the Plaza 500 property to FPR Holdings.  Since we agree with the chancellor that the Agreement granted Donatelli & Klein such authority, we need not consider the remaining arguments, and we will affirm the decree appealed from.

Affirmed.

24