EYETICKET CORPORATION
f/b/o Iridian Technologies,
Inc., Plaintiff,

v.

UNISYS CORPORATION, Defendant.

No. Civ.A. 200CV940.

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 23, 2001.

---

Thomas M. Buchanan, Michael T. Dyson, Winston & Strawn, Washington, DC, Michael J. Lichtenstein, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Stephen Edward Noona, Kaufman & Canoles, PC, Norfolk, VA, for plaintiff.

Robert A. Gutkin, Blair Martin Jacobs, Robert James Walters, Pillsbury Winthrop LLP, McLean, VA, for defendant.

### OPINION ON GRANT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

MORGAN, District Judge.

On December 18, 2000, the Court held a hearing on Plaintiff's Motion for a Temporary Restraining Order and Motion for Expedited Discovery. The Court ruled from the bench, granting a temporary restraining order against the Defendant, subject to the posting of bond. The Court also permitted both parties to engage in expedited discovery, allowing each party to depose two key witnesses prior to the hearing on the Motion for Preliminary Injunction.

On December 29, 2000, the Court held a hearing on the Plaintiff's Motion for Preliminary Injunction. At the conclusion of that hearing, the Court extended the previously issued temporary restraining order for ten more days, and the Court took the Motion for Preliminary Injunction under advisement. After due consideration, the Court **GRANTED** the Plaintiff's Motion for Preliminary Injunction by Order dated January 8, 2001. This Opinion sets forth the reasoning upon which the Court granted and extended the Temporary Restraining Order and granted the Plaintiff's Motion for a Preliminary Injunction.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

The Plaintiff, EyeTicket Corporation ("EyeTicket"), specializes in the practical application of biometrics, the science of identifying a person by a specific physical characteristic. The best known example of biometric technology is fingerprinting. EyeTicket, however, focuses on iris (the colored portion of the eye) recognition technology. According to the Plaintiff, this biometric technology has the most potential for high volume commercial applications. (Complaint, ¶¶ 7, 8). EyeTicket has focused its energies specifically in the application of this technology to ticketing and boarding in the airline industry.

Iridian Technologies, Inc. f/k/a Iriscan, Inc. ("Iridian") is a leading developer of iris recognition technology. Iridian owns United States Patents 4,641,349 and 5,291,-560 (the "Patents"). (Pltf.'s Mem.Supp. TRO, Exs. A (Patent 4,641,349) and B (Patent 5,291,560)). Iridian also allegedly owns numerous corresponding international patents, including Canadian Patent 1244552.[2] (Complaint, ¶ 10). Iris recognition technology uses video cameras to take a picture of the iris and computer software to generate a unique map of an individual's particular iris, such that it can be used as a means of secure identification. (*Id.* at ¶ 11).

On March 24, 1999, EyeTicket (by its former name, Spring Technologies, Inc.) entered into an exclusive licensing agreement with Iridian (the "License Agreement") to obtain the Patents for "product applications for automated ticketing and authentication in the public air transportation carrier industry encompassing air transportation applications (i.e., scheduled and charted U.S. and foreign air carriers) including boarding of aircraft, with or without an instrument, by passengers and airline/airport personnel, and including development, deployment, and use of a reservations and/or booking system to operate alone and/or interface with existing industry systems in order to support the iris recognition application" (the "Field of Use"). (Pltf.'s Mem.Supp. TRO, Exhibit C (License Agreement), § 1.8). Iridian granted to EyeTicket the exclusive right to purchase, distribute, sell, and service Iridian technology in the Field of Use. (*Id.* at § 3.1). The term of the license was to terminate on December 31, 1999 with an optional extension till June 30, 2000. (*Id.*).

EyeTicket developed a business plan to market its exclusively licensed technology to airlines for universal passenger check-in and boarding services. The service would allow passengers to check-in with one look at a camera, which would automatically notify the computer of the passenger's airline. EyeTicket would profit by charging the airlines a fee for each passenger that used the service. (Complaint, ¶ 12).

Representatives of the Plaintiff met with representatives of the Defendant, Unisys Corporation ("Unisys"), in July of 1999, during which Unisys showed a strong interest in the application of iris recognition technology to the public air transportation carrier industry. (Smith Aff., ¶ 12; *see also* Calvesio Dep. at 20 (stating that the meeting occurred in June of 1999)). The Unisys representatives included Raymond Calvesio, Director of Airport Systems for Unisys, and John Olson, Integration Architect for Unisys. Though informed at this meeting of EyeTicket's exclusive rights, Unisys began to utilize technology covered

---

1. All factual and legal findings are for the limited purpose of determining Plaintiff's Motion for Preliminary Injunction.

2. It is not necessary for the Court to consider any issue related to these international patents for the purposes of resolving the instant motion.

by the Iridian Patents to develop and market similar iris recognition products to airlines and agencies for purposes within EyeTicket's Field of Use. Mr. Calvesio admits that after the meeting, he called Bill Vottmer, the President of Iridian, to inquire about the exclusive rights of EyeTicket, specifically requesting a copy of the Licensing Agreement. (Calvesio Dep. at 20).

Shortly thereafter, EyeTicket avers that its initially favorable relationship with KLM Royal Dutch Airlines (KLM) cooled. KLM officials explained that Unisys was marketing a similar product, which confused KLM officials because EyeTicket claimed to have exclusive rights to the technology. (Smith Decl., ¶ 14). In January of 2000, EyeTicket marketed its iris recognition technology to the airline industry at the ATTIS 2000 trade show in Orlando, Florida (*Id.* at ¶ 5). At the trade show, EyeTicket became aware that Unisys was operating a booth at the same show and marketing iris recognition technology to the airline industry within EyeTicket's exclusive Field of Use. (*Id.*). In addition, EyeTicket became aware that Unisys was publicizing the availability of these products on their website. (*See* Pltf.'s Mem.Supp. TRO, Ex. E). The Unisys website pitches its kiosk based iris recognition technology for airline check-in and boarding services: "The self-service *check-in* and border control processes are non-intrusive and expeditious.... If allowed passage, a printed receipt is presented to the client for *boarding* or border clearance." (*Id.*) (emphasis added). In a March 1, 2000 *Philadelphia Inquirer* article, Unisys also touts its new iris recognition products for the airline industry:

> The system could be used to reduce lines at departure, baggage check, baggage claim and immigration.... Unisys will develop software to link the card system to other airport computer systems, customer loyalty programs and reservations systems. Many of these systems are already available through Unisys, whose software [is] being used by 18 of the World's top 20 airports.

(Pltf.'s Mem.Supp. TRO, Ex. F). On April 18, 2000, an article in *Australian IT*, in relation to Unisys' demonstrations at a Sydney, Australia trade show, quoted a Unisys executive to say the following: "Unisys global transportation business relations executive Doug Broadhurst said there was strong interest from the local airline industry.... Unisys is rolling out iris technology...." (Pltf.'s Mem.Supp. TRO, Exhibit G).

Subsequent to the ADDIS trade show, Unisys representatives contacted Iridian representatives apparently to discuss EyeTicket's reaction to its demonstration at the trade show. Mr. William Vottmer, the President of Iridian, sent the following email to John Calvesio of Unisys on January 28, 2000:

> Ray—I received a message from Lisa that said you had spoken. I'd like to spend a moment to clarify and hopefully ease some of the concern. We currently have a relationship with [EyeTicket] that gives them the right-of-first-refusal to ticketing applications for travel and sports event. They do not have any say in immigration, baggage or any other type travel scenarios. **This agreement expires mid year 2000 and we look to remove the right at that time (please keep this part confidential).** So, therefore, the CAC project, has no issue except perhaps the later phases but we will have the rights resolved by then. The Schipol opportunity could have an issue, **but as I committed to you on the phone that we (IriScan) would run interference to ensure that there is no issue.** John Siedlarz and I have been on the same page and have both spoken

with [EyeTicket] several times about a) either Unisys will sub work to [EyeTicket] based on Unisys' plans and needs (please seriously consider this), or b) IriScan will fund the appropriate commissions to [EyeTicket] should Unisys be the contract holder and determine to not use [EyeTicket]. We thought we had an initial acceptance of these conditions from [EyeTicket], but your relayed message suggests that perhaps we (Iriscan) need to go back and revisit. . . .

(Def.'s Mem.Opp. TRO, Attach. A) (emphasis added).

After becoming aware of these perceived violations of its licensing agreement, EyeTicket elected to sue the patentee, Iridian, in this District. Before the court made any determinations, even as to injunctive relief, Iridian and EyeTicket negotiated a settlement agreement, disposing of all disputed issues between the parties (the "Settlement Agreement"). The Court made the Settlement Agreement part of its Consent Order, dismissing the action with prejudice and finding the patents valid and enforceable. (Pltf.'s Mem.Supp. TRO, Exhibit I (Consent Order)). Pursuant to this agreement EyeTicket's period of exclusivity was extended until December 31, 2000. Also as a part of the Settlement Agreement, on September 21, 2000, Iridian sent a letter to Raymond Calvesio of Unisys and Larry P. Byrnes, counsel for Unisys, stating that "it would be improper for any other company to purchase, sell, distribute, or service IriScan Products in any of these areas, or to develop, deploy or use reservations systems supporting the iris recognition application." (Pltf.'s Mem.Supp. TRO, Ex. J). According to Mr. Calvesio, Mr. Vottmer of Iridian called him after the final settlement of EyeTicket's action against Iridian. Mr. Calvesio testified in his deposition that Mr. Vottmer said that he could not disclose the ending date of the extension of the exclusivity period for Ey-

eTicket, provided for by the Settlement Agreement, but he said "since I can't tell you explicitly what it is, let me give you a clue. The clue is when your giving gifts to your friends, then it's almost over." (Calvesio Dep. at 141). Mr. Vottmer also said that after the end of their contract, EyeTicket's Field of Use would be non-exclusive. (Id.).

In a meeting on October 20, 2000, Evan R. Smith, EyeTicket's Senior Vice President met with Mr. Calvesio of Unisys, in which, according to Mr. Smith, he recognized and acknowledged EyeTicket's exclusive rights in this area. (Smith Decl., ¶ 22). The Plaintiff alleges that despite the assurances of Unisys at the October meeting, the Defendant continued to "systematically and willfully violate EyeTicket's exclusivity and to attempt to poach potential customers from Eye Ticket." (Complaint, ¶ 27). The Plaintiff became aware of the Defendant's continual marketing of its iris recognition service to the airline industry at COMDEX, a major trade show in Las Vegas, Nevada, held November 13–17, 2000. Unisys operated a booth where it was allegedly marketing an immigration processing application, but Unisys was also covertly marketing an airline passenger processing system as well. (Smith Decl., ¶¶ 25–27). The Plaintiff also operated a booth at this show, and a representative of the Plaintiff became suspicious of Unisys' continued marketing of a competing system. When Mr. Smith approached the booth of the Defendant, the representatives would alter their presentation. Yet from afar, Mr. Smith noticed that Unisys was in fact continuing to market airline boarding products for "Unisys World Airlines." In a ruse, the Plaintiff left the convention a day early. (Id.). Mr. Smith sent EyeTicket's Director of Security, Raymond C. Leak, back to the trade show with another company employee.

Then, Mr. Leak took photographs while his cohort received a full presentation of these competing products by the Defendant. (*See generally* Pltf.'s Mem.Supp. TRO, Ex. M (Leak Aff.) and Ex. N (Desot Aff.)). In addition to the affidavits of the two employees who witnessed the demonstrations, the Plaintiff offered photos and other proof of these demonstrations of competing products, depicting Unisys representatives demonstrating an airline passenger check-in and boarding application. (Pltf.'s Mem.Supp. TRO, Ex. O). The EyeTicket employee even received a printout of her ticket and boarding pass. (*See* Pltf.'s Mem.Supp. TRO, Exs. P and Q).

The Defendant contends that it has made no sales of iris recognition technology for any applications other than border crossing applications. The Defendant Unisys admits it received a contract for Phase I of the Canadian Airports Council (CAC) project, but the Defendant maintains that this project is purely for the application of iris recognition technology to border crossings. Plaintiff alleges that Unisys would not have received the immigration contract but for representations that it could provide airline boarding applications as well for the later phases of the contract. (Complaint, ¶ 38). The Request for Proposal (RFP) for the CAC project states that "[t]his RFP deals only with the development of the automated border clearance system" but "the base system must however have the ability to support these future developments." (Pltf.'s Mem.Supp.Prelim.Inj., Ex. 4 (CAC Request for Proposal)). In addition, the Plaintiff alleges that Unisys has negotiated with many other potential customers, causing injury to the Plaintiff. The Defendant admits to providing demonstrations to the following airlines: (1) United Airlines in June 2000 (Calvesio Dep. at 206); (2) Northwest Airlines in the Summer of 2000 (Calvesio Dep. at 207); and (3) Scandinavian Airlines in

June of 2000 (Calvesio Dep. 240–41). In addition, to the two trade shows mentioned above, ATTIS and COMDEX, Defendant also admits to providing demonstrations at the Unisys Trade Show in Sydney, Australia in April of 2000 (Calvesio Dep. at 208) and the Minnesota State Fair on August 11, 2000 (Calvesio Dep. at 190), as well as in relation to the Schippol Airport Pilot Project in 1999 (Calvesio Dep. at 66–67) and in relation to the Schippol Airport Authority Contract in July of 2000 (Calvesio Dep. at 61–63).

Both EyeTicket and Iridian have sent cease and desist letters to the Defendant prior to the filing of the instant action. (Pltf.'s Mem.Supp. TRO, Ex. R (EyeTicket letter) and T (Iridian letter)). The Defendant responded by denying any wrongdoing, stating that "we do not understand how the identified field of exclusivity from the letter applies to what we describe in our literature." (Pltf.'s Mem .Supp. TRO, Ex. U (Unisys letter)). Plaintiff subsequently brought the instant action alleging: (1) patent infringement, seeking both damages and injunctive relief; (2) tortuous interference with the License Agreement and Settlement Agreement; and (3) tortuous interference with prospective advantage.

## JURISDICTION

As a case involving a claim for patent infringement, this Court has original jurisdiction of this matter. 28 U.S.C. § 1338(a).

## OPINION

Congress has authorized district courts in patent cases to grant injunctions "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. Section 283 authorizes courts in infringement actions to grant preliminary injunc-

tions pending trial, as well as permanent injunctions after a full determination on the merits.

■ The opinions of the United States Court of Appeals for the Federal Circuit are binding on federal district courts in matters concerning patent law. *Panduit Corp. v. All States Plastic Mfg. Co. .*, 744 F.2d 1564, 1573, 223 U.S.P.Q. 465, 470 (Fed.Cir.1984) (per curiam), *overruled on other grounds, Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985). In its *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 7 U.S.P.Q.2d 1191 (Fed.Cir.1988), decision, the Federal Circuit stated:

> We note that confusion exists on the issue whether, in view of *Panduit*, Federal Circuit law or regional circuit law provides the standards governing the issuance of an injunction pursuant to § 283. Because the issuance of an injunction pursuant to this section enjoins 'the violation of any right secured by a patent, on such terms as the court deems reasonable,' a preliminary injunction of this type, although a procedural matter, involves substantive matters unique to patent law and, therefore, is governed by the law of this court.

*Hybritech*, 849 F.2d at 1451 n. 12, 7 U.S.P.Q.2d at 1201 n. 12. Therefore, the Federal Circuit test, rather than the Fourth Circuit's "balance of hardship test" set forth in *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d 189, 195 (4th Cir.1977), applies to this action. The Federal Circuit requires that in seeking a preliminary injunction, a party must establish a right thereto in light of four factors:

(1) reasonable likelihood of success on the merits,

(2) irreparable harm,

(3) the balance of hardships tipping in its favor, and

(4) the impact of the injunction on the public interest.

*Hybritech*, 849 F.2d at 1451, 7 U.S.P.Q.2d at 1195. Taken individually, these factors are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested. *Id.* (citing *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1269 n. 2, 225 U.S.P.Q. 345, 346 n. 2 (Fed.Cir.1985)). In that way, the Federal Circuit test does not greatly differ from the Fourth Circuit's "Balance of Hardship" standard. The district court must make a finding as to these four factors and, in its discretion, weigh the relative strengths and weaknesses of these findings against the relief sought.

Before the Court can begin to make findings as to these four elements, the Court must resolve two preliminary matters raised by the Defendant. First, the Defendant challenges the Plaintiff's standing to bring a claim for infringement pursuant to the Patent Act without joining the patentee. Second, the Defendant contends that the Settlement Agreement between Iridian and the Plaintiff released the Defendant from all claims related to the Iridian Patents, and "there can be no preliminary injunction where there are no valid causes of action." (Def.'s Mem.Opp.Prelim.Inj. at 10).

## I. Standing of the Plaintiff

The Defendant has challenged the standing of the Plaintiff to bring an action under Section 283. 35 U.S.C. § 283. "It is well established ... that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Arkansas*, 495 U.S. 149, 154, 110 S.Ct.

1717, 109 L.Ed.2d 135 (1990). Standing to sue for patent infringement derives from the Patent Act, which provides that the patentee, or his successors in interest, "shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. Section 261 further provides for the right to transfer "title" to the patent, or assign the patent. 35 U.S.C. § 261. Thus, proper assignees may rightfully succeed to all the statutory rights of the original patentee, including the right to sue for infringement under 35 U.S.C. § 281. An infinite range of contractual possibilities exist that fall short of a complete assignment of all rights under the patent, and the Federal Circuit has constructed several broad categories to classify the standing of such licensees to sue for infringement under Section 281. *Id.*

■ At the bottom of the spectrum is the "bare licensee." The bare licensee possesses no more than a non-exclusive license under the patent. The "bare licensee" has no standing to sue for infringement under the Patent Act. *Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1553, 35 U.S.P.Q.2d 1065, 1076. Exclusive licensees fall into two categories: exclusive licensees with "all substantial rights under the patent" and exclusive licensees with something less, for the purposes of discussion "strong licensees" and "weak licensees." Intuitively, "strong licensees" with "all substantial rights under the patent" are treated akin to assignees, and the Federal Circuit has held that where a patentee makes an assignment of "all significant rights under the patent," the assignee is deemed the "effective patentee," and as such, an assignee has standing to sue in its own name for patent infringement. *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.,* 52 F.3d 1026, 1030, 34 U.S.P.Q.2d 1444, 1446 (Fed.Cir.1995). Unlike the "bare licensee," exclusive licensees

with something less than all of the substantial rights under the patent, or "weak licensees," do have some standing under the act. The Federal Circuit has held that "weak licensees" may bring actions in their own name, but they must join, either voluntarily or involuntarily, the patentee or successor in interest as a party to the action. *Abbott Labs. v. Diamedix Corp.,* 47 F.3d 1128, 1131, 33 U.S.P.Q.2d 1771, 1774.

There is the invariable exception to the exception. The "weak licensee" may bring an action in its own name "where 'necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself.' " *Textile Prods., Inc. v. Mead Corp.,* 134 F.3d 1481, 1484, 45 U.S.P.Q.2d 1633, 1635 (Fed.Cir.1998) (citing *Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891)). This exception to the requirement of a "weak licensee" to join the patentee, however, must be clearly distinguished from the category of "strong licensees," which the case law treats as equivalent to assignees and permits to bring actions against third parties for infringement in their own name. The Defendant has at times failed to distinguish these two independent concepts. (*See, e.g.,* Pltf.'s Mem.Opp.Prelim.Inj. at 19).

The Plaintiff, EyeTicket, sues the Defendant, Unisys, for patent infringement in its own name for the benefit of Iridian, the Patentee. Iridian has not assigned the relevant patents to EyeTicket. Therefore, as discussed *supra,* in order for EyeTicket to have proper standing to bring this infringement action in its own name, it must be a "strong licensee," an exclusive licensee with "all substantial rights under the patent." To determine whether a license agreement has conveyed all substantial rights under the patent, the Court must ascertain the intent of the parties and

examine the substance of what was granted. *Prima Tek II, L.L.C. v. A–Roo Co.,* 222 F.3d 1372, 1378, 55 U.S.P.Q.2d 1742, 1746 (Fed.Cir.2000). The Defendant makes two principal arguments that the Plaintiff lacks sufficient standing without joining Iridian. First, the Defendant argues that the Plaintiff only received a license for a limited field of use, thus not equivalent to all substantial rights under the patent. (*See, e.g.,* Pltf's Mem.Opp. TRO at 6–7). Second, the Defendant argues that the Plaintiff has no standing to request relief beyond the December 31, 2000 expiration of the exclusive license agreement between the Plaintiff and Iridian.

■ In arguing that the Plaintiff only received a limited field of use and does not possess all substantial rights under the patent, Unisys points to various restrictions in the License Agreement: "a limited field of use (§ 1.8); excluded markets (§ 1.5); prohibited territories (§ 1.20); the right to purchase [,] distribute and sell products in certain territories (§ 3.1), but no right to manufacture anything other than limited products (§ 3.4); and the right of either party to bring suit against third parties for infringement, provided that the lawsuit is brought in the name of IriScan [the former name of Iridian] or by both parties acting jointly as plaintiffs (§ 7.3)." (Def.'s Mem.Opp. TRO at 6). These purported substantial rights not granted to the licensee may be grouped into three categories and dealt with accordingly. Sections 1.20 and 3.1 deal with whether geographic restrictions withhold substantial rights. Sections 1.8, 1.5 and 3.4 deal with whether or not a grant of a limited field of use under a broad patent inherently withholds substantial rights as to the many other fields of use available under the patent. Finally, Section 7.3 concerns the contractual agreement between the parties over the right to sue.

The parties' contractual provision concerning the right to sue is not really relevant to the Court's inquiry as to standing. It is the province of the courts to determine whether a licensee is a "strong licensee," such that it may bring an action for infringement in its own right. That determination requires the Court to assess whether the license agreement has conveyed all substantial rights under the patent by ascertaining the intention of the parties and examining the substance of what was granted. *Prima Tek,* 222 F.3d at 1378, 55 U.S.P.Q.2d at 1746. The Court does not perform this inquiry merely because it lacks evidence of the intention of the parties in allocating the right. The Federal Circuit has developed the categories and exceptions noted above in interpreting and construing Section 261, which provides for assignments of patents, and Section 281, which provides for the right to sue for infringement. 35 U.S.C. §§ 261, 281. "Standing" to bring suit under these provisions of the Patent Act may not be given by contract, for the parties may not grant what they do not have the power to give. *See Ortho,* 52 F.3d at 1034, 34 U.S.P.Q.2d at 1450 ("We conclude that the right to sue clause has no effect in this case .... a contract cannot change the statutory requirement for suit to be brought by the 'patentee.'"). Likewise, a party may not assign or grant all substantial rights under the patent and restrict the ability of the licensee to bring suit in its own name. If the party lacks the power to grant such a right, then it necessarily lacks the power to prohibit such a right. Nevertheless, one party may be liable to another *ex contractu* for failure to abide by an agreement concerning the right to sue, but the presence or absence of such a provision does not affect that party's standing before this Court. Accordingly,

Section 7.3 of the License Agreement is not relevant to this consideration, but the Court, nevertheless, notes that EyeTicket has brought its action in the name of Iridian in compliance with Section 7.3, which provides that either the action be brought in the name of Iridian or as co-plaintiffs with Iridian. (Pltf.'s Mem.Supp. TRO, Exhibit C (License Agreement), § 7.3).

■ The Defendant cites Sections 1.20 and 3.1 of the License Agreement for the proposition that geographic restrictions evidence the withholding of substantial rights in the form of those geographic areas. (*Id.* at §§ 1.20, 3.1). This argument is without merit. Section 261, 35 U.S.C. § 261, recognizes and courts have long held that an exclusive territorial license is equivalent to an assignment and may therefore confer standing upon the licensee to sue for patent infringement. *Prima Tek*, 222 F.3d at 1377, 55 U.S.P.Q.2d at 1745. The Defendant focuses on the few territories excluded from the license as evidence of an absence of substantial rights, while illogically ignoring the fact that the exclusivity rights of the remaining territories is sufficient to qualify as an exclusive territorial license. In actuality, Section 3.1 only excludes the Republic of South Korea and provides for a non-exclusive license in Japan. Therefore, EyeTicket has an exclusive territorial license for the whole world except Japan and South Korea, a finding that in and of itself makes a strong case for standing under Federal Circuit precedent. *See id.*

■ Finally, the Defendant points out that Sections 1.8, 1.5 and 3.4 of the License Agreement deal with whether or not a grant of a limited field of use under a broad patent inherently withholds substantial rights as to the many other fields of use available under the patent. (Pltf.'s Mem.Supp. TRO, Exhibit C (License Agreement), §§ 1.8, 1.5, 3.4). Simply, can

their be a "strong licensee" with all substantial rights for one of many fields of use within a given patent. The Federal Circuit impliedly answers the question in its definition of exclusive license: "an exclusive license is a 'license to practice the invention ... accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave.'" *Textile Prods., Inc.*, 134 F.3d at 1484, 45 U.S.P.Q.2d at 1635; *see also James v. Victor Co. of Japan Ltd.*, 48 U.S.P.Q.2d 1789, 1791 (D.Md.1998) ("[A] license is exclusive 'only if the patentee has promised, expressly or impliedly, that others shall be excluded from practicing the invention' within the field covered by the license.' "). Obviously, from the Federal Circuit's formulation of its definition of exclusivity, exclusivity is judged by field of use. Likewise, assignments or exclusive licenses tantamount to assignments must appropriately be judged by field of use. Thus, the limitation of the License Agreement to a particular field of use does not prohibit the licensee from being considered a "strong licensee," competent to sue for infringement in its own name.

■ Even if EyeTicket does not qualify as a "strong licensee," the Court **FINDS** that it qualifies as a "weak licensee" which may bring an action in its own name, the exception to the exception noted *supra*. Though not embodying the specific example of a "weak licensee" suing the patentee, allowing Iridian to successfully "run interference" while Unisys infringes upon the license conveyed by Iridian to EyeTicket equates to " ... an absolute failure of justice, ..." as contemplated by *Textile Productions*. *Textile Prods.*, 134 F.3d at 1484, 45 U.S.P.Q.2d at 1635. The interplay between the conduct of Iridian and Unisys is discussed in further detail *infra*. Therefore, even if denominated a "weak

licensee," the interests of justice would demand that EyeTicket be accorded sufficient standing to bring an action in its own right.

▆ In addition to the foregoing allegations concerning standing, the Defendant also argues that the expiration of the exclusive license on December 31, 2000 removes any standing by the Plaintiff. The parties have not offered and the Court has not uncovered any cases directly addressing the issue of the effect of the expiration of a patent license on the standing of a litigant to obtain injunctive relief for the infringement of the patent prior to expiration. The issue of whether or not injunctive relief may be granted after the expiration of the patent, as opposed to an exclusive license for the patent, is a more widely addressed area of law. *See generally* Christopher A. Cortopia, Note, *Post–Expiration Patent Injunctions*, 7 Tex.Intell.Prop.L.J. 105 (1998). Though not without divisions of authority, the patent expiration cases provide an analogous situation from which the Court may draw.

The two most significant concerns that arise when a district court contemplates issuing an injunction after the expiration of the patent are, first, whether or not the court is improperly extending the statutory life of the patent and in doing so thwarting basic policies underlying the patent laws, and second, is an injunction rather than monetary relief the appropriate remedy. *Id.* at 107. The first concern is avoided in this case because the Patents are still in effect, only their exclusive rights in the Plaintiff have expired. Therefore, the Court is not confronted with the difficult task of contemplating the extent of the courts' equitable powers contra the Patent Act and its policies.

The second principle concern in the context of patent expiration and equitable relief is the appropriateness of money damages versus the proposed equitable relief. For the limited purposes of this preliminary injunction inquiry, however, that concern has been addressed in the Court's analysis of irreparable harm, *infra*. For the issuance of any injunction, if money damages will be adequate compensation and the availability of such funds is secured, then no injunction should issue for irreparable harm is not present. For the reasons discussed *infra*, however, the Court finds irreparable harm. Therefore, perforce the Court has determined that money damages alone would not make the Plaintiff whole.

Other district courts have issued injunctions that extended beyond the expiration of the patent—mindful of the above concerns. *See, e.g., Smith Int'l, Inc. v. Hughes Tool Co.,* 229 U.S.P.Q. 81 (C.D.Cal.1986) (affirming injunction that prohibited sales of infringing product for 6 months after expiration of the patent). In *Smith,* the court issued an injunction prohibiting sales of the already manufactured products for the time period it would have taken to develop the requisite technology after expiration of the patent. *Id.* at 103. The Court now faces a similar situation to that in *Smith,* but the Court is relieved of the principle concerns that troubled those courts that decided not to issue injunctions when confronted with similar situations. *See, e.g., Brulotte v. Thys Corp.,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964) (reversing lower court decision to allow the plaintiff to collect royalty payments which accrued after the patent expired) ("... we conclude that a patentee's use of a royalty agreement that projects beyond the expiration of the patent is unlawful per se. If that device were available to patentees, the free market visualized for the post-expiration period would be subject to monopoly influences that have no place there."). Ac-

cordingly, this Court **FINDS** that for the purposes of this Motion for Preliminary Injunction, the Plaintiff has made a clear showing that it has the requisite standing and this Court has the requisite authority to issue an injunction that extends beyond the exclusive license period for the Patents under the License Agreement.[3]

## II. Release of Claims by the Settlement Agreement

■ As a second preliminary matter, the Defendant asserts that the Plaintiff has already settled and released the claims that form the subject matter of this lawsuit. The Defendant bases this argument on the language of the Settlement Agreement between Iridian and EyeTicket, settling EyeTicket's earlier lawsuit against Iridian. Unisys was neither a party to the lawsuit nor the Settlement Agreement. Unisys, nevertheless, maintains that it was a third party beneficiary of this Agreement, and, therefore, should be permitted to enforce the release against the Plaintiff, which would arguably bar the claims raised in this action.

For the purposes of this Motion for a Preliminary Injunction, the Court need not make a final determination as to the issue of settlement and release. Even were this Court to find the Defendant an intended beneficiary to the Settlement Agreement, the Defendant could only avail itself of the protection of the settlement and release to the extent the promisee, Iridian, could so avail itself: the intended third party beneficiary stands in the place of the promisee. 17A Am.Jur.2d Contracts § 460 (1991 & Supp.2000). Accordingly, the Defendant could only enforce the release subject to

any defenses of the promisor to the promisee's enforcement. *Id.*

The contents of the Vottmer e-mail (provided in full *supra* ), the conversations between Vottmer and Calvesio as recounted by Calvesio in his affidavit, and the language of the Vottmer letters to Unisys suggest that Iridian has made a limited effort to abide by the terms of both its original License Agreement and the extension thereto. The latter having been negotiated as part of the Settlement Agreement between Iridian and the Plaintiff. Instead, Iridian appears to be "toadying" to the desires of Unisys so that it may retain Unisys' business for the day when its obligations to EyeTicket expire. While Indian is not separately represented in the instant litigation, Unisys has placed Iridian's conduct in issue by relying upon it as a justification for Unisys' allegedly infringing conduct.

Many times during the preliminary hearings and in its pleadings, the Defendant has offered the putative defense that Iridian had told them their actions complied with the License Agreement and encouraged them in these "marketing" efforts. (*See, e.g.,* Prelim. Inj. Hr'g Tr. at 33 (". . . I think the facts will show Your Honor that everything that Unisys has done within this field of use, outside this field of use, every act that they have taken, they have taken in good faith because they were informed [by Iridian] that they could go there.")). Thus, logic dictates that if the Court were to find these marketing efforts did infringe upon the Iridian Patents, exclusively licensed to the Plaintiff, then Iridian would have been encouraging the infringement of its License Agreement and Settlement Agreement with the Plain-

---

**3.** The Court's ruling as regards standing is only for the purposes of the instant motion, and the Defendant may of course revisit this issue by appropriate motion. For the pur-

poses of a Motion for Preliminary Injunction, however, the Plaintiff has provided a sufficiently clear showing of standing.

tiff. By whatever denomination—bad faith, fraud or breach of an express condition of the Settlement Agreement—such actions by Iridian could constitute a breach of Iridian's duties as the promisee under the Settlement Agreement. A breach by the promisee would be a defense to the enforcement of the Settlement Agreement against both the promisee and a third party beneficiary seeking to enforce the Agreement. Accordingly, a finding by this Court of a likelihood of success on the merits, i.e., that the Defendant's actions constituted infringement of the Iridian Patents, would be evidence that Iridian breached its Settlement Agreement by representing (carelessly or intentionally) to Unisys that its actions would not violate the License Agreement and infringe the Patents licensed to the Plaintiff. In that event, the release portion of the Settlement Agreement may not be enforceable by Unisys as a third party beneficiary (or by Iridian for that matter). Therefore, the determination of the likelihood of success on the merits of the allegations of infringement, discussed *infra*, eliminates the Settlement Agreement as a potential bar to the Plaintiff's preliminary injunctive relief, and the Court need not consider whether Unisys might otherwise reap the benefit of the Settlement Agreement as a third party beneficiary.

## III. Standard for Preliminary Injunction

Having resolved the preliminary matters of standing and release, the Court will now consider each of the four factors that comprise the Federal Circuit's test for determining whether a preliminary injunction should issue: (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest. *Hybritech*, 849 F.2d at 1451, 7 U.S.P.Q.2d at 1195. The Court will then weigh and mea-

sure each factor against the other factors and against the form and magnitude of the relief requested. *Hybritech*, 849 F.2d at 1451 n. 13, 7 U.S.P.Q.2d at 1201 n. 13 (citing *Roper*, 757 F.2d at 1269 n. 2, 225 U.S.P.Q. at 346 n. 2).

### A. Reasonable likelihood of success on the merits

A party seeking a preliminary injunction must establish that it has a reasonable likelihood of success on the merits when the trial court ultimately adjudicates the dispute. In seeking a preliminary injunction pursuant to Section 283, a patent holder must establish a likelihood of success on the merits both with respect to validity of its patent and with respect to infringement of its patent. *Hybritech*, 849 F.2d at 1451, 7 U.S.P.Q.2d at 1195.

#### 1. Patent Validity

As to validity, the Plaintiff notes that patents are presumed valid under 35 U.S.C. § 282. The Plaintiff further offers the Consent Order, wherein "[t]he parties agree and it is hereby ORDERED that Iriscan, Inc.'s U.S. copyrights and patents are valid and enforceable." (Pltf.'s Mem. Supp. TRO, Ex. I (Consent Order), ¶ 3). The Defendant contends that for purposes of a preliminary injunction, the Plaintiff may not rely on the presumption but must make a strong showing that the patent will likely be upheld as valid and enforceable. (Def.'s Mem.Opp.Prelim.Inj. at 20 ("EyeTicket does not satisfy its burden of a 'clear showing' that the patents are valid and enforceable"); Def.'s Mem.Opp. TRO. at 9 ("The Plaintiff must make a strong showing that the patent will likely be upheld as valid and enforceable.")). The Defendant further maintains that as both parties to the action in which the Consent Order was issued, Iridian and EyeTicket, had an interest in finding the patents valid and en-

forceable, such stipulation should have little precedential weight. (Def.'s Mem.Opp. TRO at 10). Accordingly, the Defendant alleges that the Plaintiff bears the burden of coming forward with affirmative evidence of validity and enforceability, and the Plaintiff has not made a clear showing as to validity.

The deficiency with the Defendant's argument that the Plaintiff has not made a clear showing as to validity is that the Defendant has not genuinely contested the validity of the Iridian Patents. The Defendant cites four cases for the proposition that affirmative evidence of validity is required. (Def.'s Mem.Opp. TRO at 9–10). In each of these cases in which the court discussed the issue, however, the defendant asserted not just the abstract concept that the patent might be invalid, but alleged a specific basis for the assertion of invalidity. *See, e.g., Black and Decker, Inc. v. Hoover Serv. Ctr.,* 765 F.Supp. 1129, 1134, 20 U.S.P.Q.2d 1612, 1614 (D.Conn.1991) ("Hoover has asserted that the 074 reissue patent is invalid and unenforceable for several reasons...."); *Nutrition 21 v. Thorne Research, Inc.,* 930 F.2d 867, 869–70, 18 U.S.P.Q.2d 1347, 1349 (Fed.Cir.1991) ("Thorne [the Defendant] raised substantive issues respecting the validity and enforceability of the '927 Patent.... The record contains explicit evidence that the inventor, Gary Evans, overcame a rejection of his claims, at least in part, on the basis of a now admittedly inaccurate affidavit ..."). The Defendant does not offer even a broad basis, such as obviousness or inaccuracies in the application, as in *Nutrition 21,* upon which it reasonably asserts that the Patents' validity is questioned. Without a specific allegation to refute, the Plaintiff would not know what is necessary to plead in order to make a "clear showing." Under the Defendant's framework, absent a contested adjudication of validity, the Plaintiff

must engage in anticipatory refutation of potential grounds of invalidity. This Court will not require that plaintiffs must superfluously make an affirmative showing of validity where not genuinely contested by the Defendant.

 The law actually runs quite contrary to that articulated by the Defendant. A patent is presumed to be · valid. 35 U.S.C. § 282. At the preliminary injunction stage, a challenger's evidence of invalidity must be "sufficiently persuasive that it is likely to overcome the presumption of patent validity." *PPG Indus., Inc. v. Guardian Industries Corp.,* 75 F.3d 1558, 1566, 37 U.S.P.Q.2d 1618, 1624 (Fed.Cir. 1996); *Aero Industries, Inc. v. John Donovan Enterprises–Florida, Inc.,* 80 F.Supp.2d 963, 973 (S.D.Ind.1999). The challenger's evidence must raise a "substantial question" of invalidity. *Id.* Although the party seeking a preliminary injunction bears the burden of proving likelihood of success on the merits, meeting that burden is less strenuous on the issue of patent validity because the challenger retains the burden of production and persuasion on that issue. *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387–88, 2 U.S.P.Q.2d 1926, 1927–28 (Fed.Cir.1987) (holding that at preliminary injunction stage burden of establishing invalidity remains on challenger), *overruled on other grounds by Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977, 34 U.S.P.Q.2d 1321, 1327 (Fed.Cir. 1995) (en banc); *see also Aero Industries,* 80 F.Supp.2d at 973. The Court **FINDS** that the Defendant has failed satisfy its burden of producing any evidence that would overcome the presumption of invalidity.

Furthermore, it is well-established that in the context of a motion for preliminary injunction against further infringement of

a patent, the patent holder may use a prior adjudication of patent validity involving a different defendant as evidence supporting its burden of proving likelihood of success on the merits. *H.H. Robertson,* 820 F.2d at 388–89, 2 U.S.P.Q.2d at 1928. A district court, however, is not bound, as a matter of law, by the prior adjudication of validity. *Id.* Rather, the district court in its discretion, may reasonably accord the prior adjudication of validity such weight as it sees fit. *Hybritech,* 849 F.2d at 1452, 7 U.S.P.Q.2d at 1196-7. Even were this Court to find, as the Defendant urges, that the parties to the litigation that resulted in the Consent Order finding the Iridian Patents valid and enforceable may both have been arguably disposed to such a finding of validity, the Court may still accord some precedential value to the Consent Order. "Substantial weight must be given to a patent's litigation history in connection with a motion for pendent lite." *H.H. Robertson,* 820 F.2d at 388, 2 U.S.P.Q.2d at 1928 (citations omitted). So, even were this Court to accord that Order less persuasive value than otherwise, in that the Defendant offers no bases for asserting the invalidity of the Iridian Patents, then the persuasive value of the Consent Order—albeit not strong—along with the presumption of validity would suffice to demonstrate a "clear showing" of validity for purposes of this Motion for Preliminary Injunction.

The Court **FINDS** that the Plaintiff has proven a likelihood of success at trial as to the validity and enforceability of the Patents.

### 2. Patent Infringement

A patent holder must establish a likelihood of success on the merits both with respect to validity of its patent, as discussed *supra,* and with respect to infringement of its patent. The Patent Act provides that "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. 271(a). An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed; the second step is comparing the properly construed claims to the device accused of infringing. *Markman,* 52 F.3d at 976, 34 U.S.P.Q.2d at 1326. The analysis in the instant case, however, is simplified: both parties are admittedly using the same Iridian technology. The only issue is whether the use of that technology by the Defendant intruded into the exclusive Field of Use of the Plaintiff. Therefore, the Court must first decide what activities the Field of Use encompassed. Specifically, the Defendant contends that efforts to "market" products as opposed to efforts to "sell and distribute" fall outside EyeTicket's Field of Use. Next, the Court must determine if the Plaintiff has made a clear showing of activities by the Defendant that intruded into this Field of Use.

The Defendant cannot dispute the actual conduct as alleged by the Plaintiff, instead it offers three reasons why its conduct does not infringe upon the Patents licensed to the Plaintiff. First, it argues that the Plaintiff cannot show any element of intent. Second and corollary to its first argument, the Defendant contends that it relied on representations by Iridian as to the propriety of demonstrations, as long as no sales occurred during the licensing period. Third, as noted *supra,* the Defendant contends that its activities were efforts to "market" products as opposed to efforts to "sell and distribute," and thus fall outside EyeTicket's limited Field of Use.

### a. Miscellaneous Defenses

 Before commencing the two-step infringement analysis established by the Federal Circuit, the Court will address the Defendant's first and second defenses, which do not appear to logically fall into either step. As the language of Section 271 provides "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). No element of intent is required for a cause of action for patent infringement. Though the issue of intent is relevant to the other claims of the Plaintiff for intentional interference with contractual relations and intentional interference with a prospective economic advantage, the Court does not consider it necessary to go beyond the claim for patent infringement for the purposes of this Motion for Preliminary Injunction. Nevertheless, in light of (1) Unisys' July 1999 meeting with EyeTicket; (2) Unisys' admitted discussion with William Vottmer, the President of Iridian, concerning EyeTicket's License Agreement; (3) the ATTIS trade show, in which EyeTicket notified Unisys of its infringement concerns; (4) knowledge by Unisys of the EyeTicket/Iridian litigation both through receipt of subpoenas and conversations with Iridian representatives; and (5) cease and desist letters from both Iridian and EyeTicket, the Court **FINDS** that the Plaintiff has made a substantial showing of a likelihood of success in demonstrating knowledge by the Defendant of the Plaintiff's rights and willful infringement of those rights.

For its second argument in its defense, Unisys contends that it relied on representations by Iridian as to the propriety of demonstrations, provided that no sales occurred during the licensing period. (Def.'s Mem.Opp.Prelim.Inj. at 12–14). As discussed *supra* in relation to the Settlement Agreement, the Defendant contends that Iridian advised Unisys that its "marketing" activities did not violate the License Agreement and encouraged Unisys to continue to engage in marketing activities. The "defense" that another party told the Defendant that its conduct was acceptable is unavailing. The motive behind the Defendant's allegedly infringing activity is of no relevance. There is no defense to patent infringement based upon reliance on a third party's representations, even if the third party is the patentee. Any such allegation might be germane to a claim of liability or a duty to indemnify between Unisys and Iridian, but they do not absolve Unisys of liability for any alleged infringement against EyeTicket's exclusively licensed patents. In fact, the Court notes that Section 271(b) provides a basis for independent liability for such activity, to wit, that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. 271(b).

### b. The Field of Use

 In considering the meaning and scope of the patent claims asserted to be infringed, i.e., what activities the Field of Use encompassed, the only issue before the Court is the Defendant's contention that efforts to "market" products as opposed to efforts to "sell and distribute" fall outside EyeTicket's Field of Use. This argument is meretricious. The Defendant offers no support for this proposition, understandably so because it is illogical and a strained interpretation of plain language. This Court will not pervert the ordinary or intended meaning of words to accomplish a technical result without heed for the logic or practical effects of such a conclusion. That the right to "sell" does not include

the right to "market" or "demonstrate" is illogical. One cannot sell what one does not present for sale to its intended buyer, i.e., market or demonstrate.

Furthermore, the practical result of such a finding would be the creation of turmoil. "Sell, distribute or service" and the like is standard language in the licensing industry. Should this Court so find, all licensees with agreements that do not specifically provide for the exclusive right to "market" would no longer have the right to market or demonstrate their licensed product. Or, as the Defendant suggests, licensees who receive exclusive rights to sell without the specific exclusive rights to market and demonstrate leave the patentee with the right to authorize the licensee's competitors to market and demonstrate their exclusively licensed products.

Nonetheless, even were this Court to adopt a holding that the exclusive right to sell did not include the exclusive right to market and demonstrate, it would have to accept the argument that the Defendant never intended to sell its products, just to demonstrate and market them. In other words, the Court must believe that the Defendant would have turned down offers to buy, deferring them to EyeTicket. This Court **FINDS** that there is a legitimate inference that this marketing and demonstrating was designed to subvert EyeTicket's exclusivity by generating sales prior to the expiration of the Plaintiff's period of exclusivity that would be consummated once the period of exclusivity expired.

■ In addition to the flaws in drawing a distinction between marketing and selling or demonstrating and selling, there is another strong argument that even were this Court to make that distinction, the Defendant would, nevertheless, be liable for infringement. Though not raised by the Plaintiff, the Court notes that the License Agreement defines the Field of Use

to encompass the "air transportation carrier industry ... including development, deployment, and use of a reservations and/or booking system to operate alone and/or interface with existing industry systems in order to support the iris recognition application." (Pltf.'s Mem.Supp. TRO, Exhibit C (License Agreement), § 1.8). Section 2.1 of the License Agreement, however, provides that "the right of [EyeTicket] to develop an INTEGRATED PRODUCT for the uses permitted hereunder is *non-exclusive*, except as further described in Section 3." (*Id.* at § 2.1) (emphasis added). Section 3.1 of the License Agreement sets forth the exclusive rights of the Plaintiff as follows: "IRISCAN grants to [EyeTicket] from the date hereof until December 31, 1999 ('EXCLUSIVITY PERIOD') the exclusive right to *purchase, distribute, sell and service* IRISCAN PRODUCTS and INTEGRATED PRODUCTS for the FIELD OF USE...." (*Id.* at § 3.1) (emphasis added). Obviously, there is an ambiguity between the exclusive Field of Use, which provides for exclusivity in development, deployment, and use of a reservations and/or booking system in the air transportation carrier industry, and Section 3.1, which provides that development of an integrated product for the uses permitted under the License Agreement is non-exclusive. On the one hand, development of reservations and/or booking system is an exclusive right, on the other, development of integrated products is a non-exclusive right.

As discussed *supra* in reference to the Settlement Agreement, New Jersey law would appear to govern the contract, pursuant to Section 13.6 of the License Agreement. (*Id.* at § 13.6). On basic principles of contract construction, however, New Jersey law and Virginia law are in accord. In the event of an ambiguity in the written contract, such ambiguity must be con-

strued against the drafter of the agreement. *In re Miller's Estate,* 90 N.J. 210, 447 A.2d 549, 555 (1982); *Homann v. Torchinsky,* 296 N.J.Super. 326, 686 A.2d 1226, 1231 (1997); *Donnelly v. Donatelli & Klein, Inc.,* 258 Va. 171, 519 S.E.2d 133, 140 (1999). Therefore, as the drafter of the document, ambiguities would normally be construed against Iridian and in favor of EyeTicket.[4]

Further, Iridian appears to concur that the field of exclusivity was intended to include development of reservations and/or booking systems. Where a contract is ambiguous, courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation. *County of Morris v. Fauver,* 153 N.J. 80, 707 A.2d 958, 969 (N.J.1998) (citing *Koshliek v. Board of Chosen Freeholders,* 144 N.J.Super. 336, 365 A.2d 492, 496 (1976)); *Dart Drug v. Nicholakos,* 221 Va. 989, 277 S.E.2d 155, 158 (1981) (citing *O'Quinn v. Looney,* 194 Va. 548, 74 S.E.2d 157, 159 (1953)). EyeTicket obviously believes that development of a competing reservations and/or booking system during its period of exclusivity violated the License Agreement, it is the theme of its entire action. In examining the two letters from Iridian to Unisys concerning EyeTicket's complaints of infringing activities, there is evidence that Iridian also understood EyeTicket's rights to include the exclusive right to develop reservations and/or booking systems in the air transportation carrier industry.

In the September 21, 2000 letter by William Vottmer, the President and Chief Executive Officer of Iridian, he writes to advise Unisys of the extent of EyeTicket's rights pursuant to the Settlement Agreement. (Pltf.'s Mem.Supp. TRO, Exhibit J). After reciting the language of the Field of Use, Mr. Vottmer writes, "In view of EyeTicket's exclusivity in each of these areas, it would be improper for any other company to purchase, sell, distribute, or service IriScan Products in any of these areas, *or to develop, deploy, or use reservation systems supporting the iris recognition application.*" (*Id.* (emphasis added)). Likewise, in a November 20, 2000 letter, Mr. Vottmer advises Unisys "[p]lease be aware that EyeTicket holds the Iridian Technologies exclusive through December 2000 on automated ticketing and authentication in the public air transportation carrier industry encompassing air transportation applications including boarding of aircraft *and development, deployment, and use of a reservation or booking system.*" (Pltf.'s Mem.Supp. TRO, Exhibit T (emphasis added)). The Court **FINDS** that from these letters, it is clear that both the parties to the License Agreement, EyeTicket and Iridian, understood the Agreement to provide exclusive rights to develop, deploy, and use a reservations and/or booking system in the air transportation carrier industry.

The Court **FINDS** that the Plaintiff's exclusive Field of Use included marketing and demonstrating whether for the purpose of sale or not. The Court **FINDS** that the Plaintiff's exclusive Field of Use included any development, deployment, or use of a reservations and/or booking system in the air transportation carrier industry which utilized the Iridian Patents.

### c. Intrusion into the Field of Use

██ Next, the Court must determine if the Plaintiff has made a clear showing of

---

4. Counsel for the Plaintiff represented to the Court that Iridian drafted the Settlement Agreement at the hearing on the Motion for Preliminary Injunction. (Prelim. Inj. Hr'g Tr. at 75).

activities by the Defendant that intruded into this Field of Use. The Plaintiff's evidence on this point is substantial. As discussed *supra* in the recitation of the facts, the Plaintiff has provided photos of Unisys representatives demonstrating infringing products and numerous Unisys marketing materials promoting the application of the iris recognition technology to airline passenger ticketing and boarding. The Defendant cannot contest the facts, but artfully argues that it merely marketed and demonstrated the technology; technology which it was not offering for sale. Likewise, the Defendant impliedly conceded its involvement in such activities by its argument that Iridian represented to Unisys that marketing and demonstrating the technology, without actually selling it, was appropriate under the licensing agreement. The Defendant has presented no evidence that marketing and demonstrating products within the exclusive Field of Use was exempted from the license granted to the Plaintiff. Moreover, this Court has found no credible evidence of any intent by the Defendant to restrict its actions purely to non-sale demonstrations. The Plaintiff has provided pictures and affidavits evidencing Unisys representatives' demonstrations of airline passenger ticketing and boarding applications at the COMDEX trade show, among the other incidents of Unisys representatives engaging in infringing behavior, as enumerated in the recitation of the facts. Accordingly, the Court **FINDS** the Plaintiff has made a clear showing of intrusion into its Field of Use by the Defendant through its marketing/demonstrative activities.

It is undisputed that Unisys developed and deployed a reservations and/or booking system with Iridian technology, which would constitute infringement of the exclusive license of the Plaintiff, regardless of whether sold or demonstrated. This Court **FINDS** that the evidence presented by the Plaintiff of Unisys' demonstrations at the COMDEX trade show provides sufficient proof of Unisys' development of a reservations and booking system utilizing the Iridian Patents, and the Court, therefore, **FINDS** a concomitant intrusion by the Defendant into the Field of Use of the Plaintiff.

As this Court has found a clear showing that the Patents are valid and enforceable and that the Defendant has infringed those Patents, the Court **FINDS** the Plaintiff has made a clear showing of a strong likelihood of success on the merits as to its claim of patent infringement against the Defendant Unisys.

### B. Irreparable harm

 The showing of irreparable future injury presents the most difficult element in the instant case. In matters involving patent rights, irreparable harm is "presumed when a clear showing has been made of patent validity and infringement." *H.H. Robertson Co.,* 820 F.2d at 390, 2 U.S.P.Q.2d at 1929. The Court has found that the Plaintiff has made a clear showing both as to validity and infringement. Therefore, the Court **FINDS** that the Plaintiff is entitled to a presumption of irreparable harm.

As the Plaintiff notes in its brief, however, "[t]his presumption 'derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm.'" (Pltf.'s Mem. Supp. TRO at 17) (citing *H.H. Robertson Co.,* 820 F.2d at 390, 2 U.S.P.Q.2d at 1930). With the Plaintiff's exclusive license having now expired, without the possibility of extension, the logic of an analogous presumption for licensees may not necessarily apply. Thus, the presumption may not be dispositive. Accordingly, the Court will

not rest its analysis exclusively upon a presumption of irreparable injury.

■ The purpose of a preliminary injunction is to preserve the status quo pending an adjudication of the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Issuing a preliminary injunction is appropriate when the policy of preserving the court's power to decide the merits of a case outweighs the burden of imposing an interim restraint before it can do so. *Fundicao, Tupy S.A. v. U.S.*, 841 F.2d 1101, 1103 (Fed.Cir.1988). In other words, an injunction should issue where money damages would provide an inadequate remedy or the absence of preliminary relief would eviscerate the effectiveness of ultimate injunctive relief. The element of irreparable injury goes to what would result if a preliminary injunction did not issue.

The difficulty of the instant case would be removed if this litigation involved a fungible good with a ready market. Barring other considerations, the Court might well find that any damage accruing prior to trial could easily be remedied by money damages. The determination of damages would involve no more than a simple mathematical equation. The instant case, however, deals with "cutting-edge" technology that has not yet been widely implemented but that has tremendous future potential. So, the issue of harm requires additional consideration. Difficulty in determining damages, though, is not enough to justify the extraordinary relief of a preliminary injunction. *Nutrition 21*, 930 F.2d at 871, 18 U .S.P.Q.2d at 1351 ("... neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial."). The Court **FINDS**, however, that the problem

is not simply the difficulty of determining damages in this case, but also the inability of damages to provide a full remedy for the Plaintiff if it ultimately prevails on the merits at trial.

Money damages alone cannot restore the technological lead-time that the Plaintiff would have enjoyed but for the infringement of the Defendant. EyeTicket paid for the exclusivity period not only with the hope of generating sales, but in order to establish a reputation for expertise and advanced products in this particular Field of Use. Therefore, a major element of the "benefit of the bargain" of the Licensing Agreement to EyeTicket was the establishment of a technological lead over its rivals. In trade secret misappropriation cases, lead-time injunctions to remedy an unfair technological advantage gained by one party through its inequitable conduct have become the preferred form of relief. *See, e.g., SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1266 (3d Cir.1985) ("We endorse the current trend toward so-called 'lead time' injunctions, whereby the trade secret injunction lasts only so long as is necessary to negate the advantage the misappropriator would otherwise obtain by foregoing independent development."). The Uniform Trade Secrets Act has officially adopted that remedy. *See* Unif. Trade Secrets Act § 2 cmt. (1995) (stating that "[s]ection 2(a) of this Act adopts the position of the trend of authority limiting the duration of injunctive relief to the extent of the temporal advantage over good faith competitors gained by a misappropriator.").

The inability to provide a full remedy to the Plaintiff in the event that it prevails is also exemplified by the Canadian Airport Council situation, in which Unisys is involved. The cross-marketing of the iris recognition technology to airports and airlines with its border crossing technology

might allow the Defendant to benefit from its infringement in the interim without actually producing profits that may be disgorged. Likewise, obtaining the contract for a pilot program might effectively "lock-up" customers and goodwill that could become immense revenue centers as the technology becomes accepted in the industry. Such infringement could result in non-compensable losses of market share. *See Atlas Powder Co. v. Ireco Chem.*, 773 F.2d 1230, 1233, 227 U.S.P.Q. 289, 292 (Fed.Cir.1985) (holding statute allows injunctive relief "to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money."). The Court **FINDS** that without a preliminary injunction, the Plaintiff will probably lose non-compensable market share in the relatively narrow market of the airline industry.

Furthermore, though the Plaintiff does not enjoy any beneficial presumption because it is much smaller than the Defendant, the fact that its sole line of business is this market and technology renders it more vulnerable. This vulnerability bears on the issue of the irreparability of the harm. The Court **FINDS** credible the Plaintiff's proffer to this Court that without relief from Unisys' continued infringement "EyeTicket will be unable to go forward with its business operations and may go out of business long before this case is resolved." (Smith Decl., ¶ 43). Whether or not a litigant will survive the issuance of pendent lite relief is an important consideration. *See Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 897 F.2d 511, 516, 13 U.S.P.Q.2d 2029, 2032 (Fed. Cir.1990) ("Standard Havens' harm is speculative and in any event cannot threat-

en its viability. On the other hand, a substantial amount of relevant record evidence indicates that Gencor's reasonably expected harm would be both catastrophic and irreparable. Without a stay, Gencor may well cease to exist.").

Accordingly, the Court **FINDS** the Plaintiff has demonstrated irreparable injury both presumptively and actually.

## C. The Balance of Hardships

The Defendant offers no evidence of any harm, except if the injunction were extended to border crossing technology. The Plaintiff, however, makes no claim in either its pleadings or arguments before this Court that border crossing technology is within its Field of Use, where sales and contracts are strictly limited to border crossing technology without any representations or agreements to later expand such sales and contracts to include other technology within the Plaintiff's Field of Use. The Defendant consistently maintains that its contract with the Canadian Airport Council (Phase I) only involves border crossing technology, so it would be unaffected by a preliminary injunction. (*See, e.g.*, Def's Mem.Opp. Prelim. Inj., Calvesio Aff., ¶ 12).[5] Therefore, there does not appear to be any significant evidence of potential hardship to the Defendant with regard to either its current contract with the Canadian Airport Council or any prospective contract involving border crossing technology (provided that the contract is limited to border crossing technology).

The position of the Defendant with respect to the application of iris recognition technology to the airline industry, as artic-

---

5. Both the original temporary restraining order and its extension explicitly exempted the border crossing technology from its effect, and the Order Granting the Preliminary Injunction, likewise exempted border crossing applications from the effect of the injunction. Accordingly, Defendant will suffer no hardship in either its current contract with the Canadian Airport Council or any prospective contract for border crossing technology.

ulated by Raymond Calvesio, the Director of Airport Systems for the Defendant, is as follows:

> Although Unisys has no sales of iris technology to the airline industry pending or even anticipated, Unisys would like to continue to demonstrate its iris recognition within the airline industry. Although I personally do not think the industry is yet ready for this technology, I do believe there are significant benefits form being able to present Unisys as able to provide the technology.

(Calvesio Aff(II), ¶ 11). If this Court were to hold Unisys to its own arguments above and those in which Unisys makes a clear distinction between demonstrating and selling, see *supra*, then Unisys obviously has no interest in selling the technology for the foreseeable future, merely demonstrating it. Thus, it is clear that the only hardship the issuance of preliminary injunction would impose upon the Defendant is to prevent it from demonstrating a product which it lacks the interest, expectation and capability to sell. The Court **FINDS** that the Defendant demonstrates no significant evidence of any potential hardship if the Motion for Preliminary Injunction is granted.

Whereas, the Plaintiff relies exclusively on this technology for its livelihood and may go out of business without relief, the Defendant proffers no evidence that it will suffer substantial hardship if the preliminary injunction does issue. Thus, the Court **FINDS** that the balance of hardships favors the Plaintiff.

### D. The Impact of the Injunction on the Public Interest

The Plaintiff argues that the public interest favors the general policy of protecting contractual agreements, such as the Plaintiff's Licensing Agreement with Iridian. (Pltf.'s Mem.Supp.Prelim.Inj. at 18). The Defendant concurs as to the importance of protecting contractual agreements, but points to its contractual rights as a third party beneficiary under the Settlement Agreement. The Defendant also argues that the public interest favors free competition and enforcing patents only to the limit of their claims. (Def's Mem.Supp.Prelim.Inj. at 18) (citing *Lear, Inc. v. Adkins,* 395 U.S. 653, 663–4, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) and *Multi–Tech Sys. v. Hayes Microcomputer Prods.,* 800 F.Supp. 825, 843 (D.Minn. 1992)). Obviously, in the abstract all the public interests asserted are worthy on their face: enforcing contractual rights between parties, enforcing contractual rights of third-party intended beneficiaries to contractual agreements, promoting free competition, and enforcing patents only to the limit of their claims. As applied, however, the public interest does not support enforcing the rights of parties attempting to subvert the contractual rights of another. While Unisys developed and marketed products in violation of an exclusively licensed patent, Iridian agreed to "run interference" and secretly covenanted not to renew Plaintiff's exclusive rights. (*See* Def.'s Mem.Opp. TRO, Attach. A (Vottmer e-mail)).

Furthermore, typically in a patent case "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech,* 849 F.2d at 1458, 7 U.S.P.Q.2d at 1201. The Defendant offers none and the Court cannot identify any critical public interest that would be adversely effected by the issuance of a preliminary injunction. Rather, as discussed above in consideration of the balance of hardships, the Defendant avers currently to have no more than an abstract and vague interest in the application of iris

recognition technology to the airline industry. Accordingly, the Defendant shows no real critical interest in the technology, much less a critical public interest if it is denied the right to demonstrate the technology prior to an adjudication on the merits.

Therefore, the Court **FINDS** that the public interest would be promoted by granting the Plaintiff's Motion for Preliminary Injunction.

### CONCLUSION

The Court **FINDS** that for the purposes of this Motion for Preliminary Injunction, the Plaintiff's have demonstrated the requisite standing and this Court has the requisite authority to issue an injunction that extends beyond the exclusive license period for the Patents under the License Agreement. The Court **FINDS** the Plaintiff has made a clear showing as to all four requisite elements for a Preliminary Injunction: (1) demonstrating a substantial likelihood of success on the merits as to its claim of patent infringement and in so doing a likelihood that Unisys could not rely upon any release in the Settlement Agreement; (2) irreparable harm if the injunction does not issue; (3) the balance of hardships favor the Plaintiff; and (4) the public interest supports the Plaintiff's position.

The Clerk is **REQUESTED** to send a copy of this opinion to all counsel of record.

It is so **ORDERED**.