FRED HUTCHINSON CANCER RE-
SEARCH CENTER; Argus Genetics,
LLC; and Mars, Inc., Plaintiffs,

v.

BIOPET VET LAB, INC.; and Radio
Systems Corporation d/b/a
PetSafe, Defendants.

Civil Action No. 2:10cv616.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 17, 2011.

Christopher Alan Abel, Dawn Lee Serafine, Troutman Sanders LLP, Norfolk, VA, David Marion Foster, Kimberly Sullivan Walker, Fulbright & Jaworski LLP, Washington, DC, Gilbert Andrew Greene, Gina Nobuko Shishima, Fulbright & Jaworski LLP, Austin, TX, Linda Leuchter Addison, Fulbright & Jaworski LLP, New York, NY, Marc Louis Delflache, Fulbright & Jaworski LLP, Dallas, TX, for Plaintiffs.

Brent Lee Vannorman, Gregory N. Stillman, Georgianna Gaines Ramsey, Hunton & Williams LLP, Norfolk, VA, Van Rencelliere Irion, Law Office of Van R. Irion, PLLC, Knoxville, TN, for Defendants.

### MEMORANDUM OPINION AND ORDER

RAYMOND A. JACKSON, District Judge.

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction against Defendants, BioPet Vet Lab, Inc. ("BioPet") and Radio Systems Corporation d/b/a PetSafe (collectively "Defendants"), pursuant to Rule 65 of the Federal Rules of Civil Procedure. On March 11, 2011, this Court conducted a hearing to further address arguments from both parties. For the reasons stated on the record and herein, Plaintiffs' Motion for a Preliminary Injunction is **GRANTED.**

## I. FACTUAL AND PROCEDURAL HISTORY

In December 2003, Plaintiff Fred Hutchinson Cancer Research Center ("FHCRC") filed a patent application for its dog breed identification technology. Mem. in Supp of Pls.' Mot. for TRO and Prelim. Inj. at 2. On June 1, 2010, it received United States Patent No. 7,729,863 ("the '863 patent") for the technology. *Id.* FHCRC exclusively licensed this technology, along with the patent application, to Argus Genetics, LLC ("Argus") on August 9, 2005. *Id.* Argus then sublicensed the

technology and patent rights to Mars, Inc. ("Mars") in exchange for payment of a royalty. *Id.* On December 17, 2010, Plaintiffs filed a Complaint in this Court against BioPet Vet Lab, Inc., alleging that Defendant had infringed and was currently infringing "one or more of the claims of the '863 patent by using, selling and offering to sell the dog breed identification services associated with its DNA Breed Identification Kit product." Compl. ¶ 14. On January 31, 2011, upon learning that another company planned to market BioPet's product at an upcoming veterinary conference, Plaintiff filed an Amended Complaint naming Radio Systems Corp. d/b/a/ PetSafe as a co-defendant in the case. Am. Compl. ¶¶ 5, 18. On February 9, 2011, BioPet filed an Answer and Counterclaim alleging that FHCRC submitted false oaths that the United States Patent Office relied on in issuing the '863 patent and requesting declaratory judgments on the grounds of invalidity, non-infringement, and unenforceability, among other claims.

On February 14, 2011, Plaintiffs filed a Motion for Temporary Restraining Order ("TRO") and a Motion for Preliminary Injunction. In these motions, Plaintiffs requested that Defendants refrain from infringing U.S. Patent No. 7,729,863 ("the '863 Patent") by using, selling, offering to sell, directly or indirectly, distributing, displaying, using in commerce, demonstrating, or advertising, directly or indirectly, in communications with veterinarians or veterinary business, or at any and all trade shows, conventions, seminars, or conferences, including but not limited to the 83rd Western Veterinary Conference in Las Vegas, Nevada, set for February 20–24, 2011 the following: (1) DNA breed identification products, and (2) dog breed identification services associated with a DNA breed identification product. On February 18, 2011, PetSafe filed a Response in Opposition alleging that Plaintiffs' Motions for

TRO and Preliminary Injunction should be denied because the patent is invalid due to anticipation by prior art. Def.'s Resp. in Opp. Mot. for TRO at 6. Plaintiff's then filed a Rebuttal Brief on February 21, 2011. On February 22, 2011, this Court conducted a hearing and granted Plaintiff's Motion for TRO. On February 28, 2011, this Court entered a Memorandum Opinion and Order which explained the reasons the TRO was granted. Defendants filed a Response in Opposition to Plaintiffs' Motion for Preliminary Injunction and six declarations in support of its position on February 28, 2011. Plaintiffs filed a reply along with three declarations in support of their position on March 7, 2011. On March 11, 2011, this Court conducted a hearing to address both parties' arguments regarding Plaintiffs' Motion for Preliminary Injunction. Having been briefed and argued by both parties, this matter is now ripe for consideration.

## II. LEGAL STANDARD

■ Rule 65 of the Federal Rules of Civil Procedure provides for the issuance of preliminary injunctions as a means of preventing harm to one or more of the parties before the court can fully adjudicate the claims in dispute. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008); *Real Truth About Obama v. Federal Election Commission*, 575 F.3d 342, 347 (4th Cir. 2009) (indicating that the *Winter* standard governs preliminary injunction proceedings in the Court of Appeals for the

Fourth Circuit as well as all other federal courts).

Given this standard, adjudication of preliminary injunctions in a patent infringement case necessarily involve consideration of substantive issues regarding the patent. To the extent that substantive issues arise that fall within the specific domain of patent law, precedent from the United States Court of Appeals for the Federal Circuit governs. *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n. 12 (Fed.Cir.1988); *EyeTicket Corp. v. Unisys Corp.*, 155 F.Supp.2d 527, 535 (E.D.Va. 2001).

 A plaintiff must make a clear showing that it will likely succeed on the merits at trial before a court can issue a preliminary injunction in its favor. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008); *Real Truth About Obama v. Federal Election Commission*, 575 F.3d 342, 346–47 (4th Cir.2009). At the preliminary injunction stage, a patent enjoys the same presumption of validity as at any other stage of litigation. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed.Cir.2009); *Canon Computer Sys., Inc. v. Nu–Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed.Cir.1998). As an affirmative defense to a Plaintiff's motion for preliminary injunction, a Defendant may attack the likelihood of success by raising questions about the validity of the patent. *Titan Tire Corp.*, 566 F.3d at 1377. However, to do so, the alleged infringer must present evidence that *raises a substantial question* of invalidity. *Id.* (emphasis in original). Once an alleged infringer has presented such evidence, the burden shifts back to the patentee to present contrary evidence that they are likely to succeed at trial on the validity issue. *Id.*

## III. DISCUSSION

In support of the motion for preliminary injunction, Plaintiffs allege the following: 1) that they are likely to succeed on the merits by showing that Defendants Dog Identification Kit infringes on Claims 1, 20, 22 and 28 of the '863 patent; 2) that Plaintiffs will suffer irreparable harm based on permanent loss of customers, price erosion and losses to its reputation and goodwill; 3) that the balance of equities weighs in Plaintiffs' favor; and 4) that the public interest warrants protecting their rights under the '863 patent. *See* Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. at 12–26. This Court will address each element in turn to determine whether a preliminary injunction should be issued in this case.

### A. Likelihood of Success on the Merits

 In this case, Plaintiffs assert that they are likely to succeed on the merits based upon Defendants' alleged infringement on claims 1, 20, 22 and 28 of the '863 patent. Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. at 12. In order to prove patent infringement, Plaintiffs must compare the alleged infringing device to the properly construed claims to determine if all the claim limitations are met. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed.Cir.2001). In support of the allegation, Plaintiffs submitted a declaration from Dr. Neal Fretwell, Research and Development Director in the Mars Veterinary unit of Mars Symbioscience, a division of Mars, Inc., which contained a comparative analysis of the '863 patent claims and Defendants' dog identification products. *See generally* Fretwell Decl. In his statement, Dr. Fretwell analyzes each step of claims 1, 20, 22 and 28 of the '863 patent and concludes that both BioPet and PetSafe's products perform every step of the claims and thus are literally infringing claims 1, 20, 22 and 28 of the

'863 patent. Fretwell Decl. ¶¶ 20 and 38; *see also* Fretwell Decl. ¶¶ 13, 15, 17, 19, 31, 33, 35, and 37. Plaintiffs also submitted a declaration from Mr. Michael J. Price, General Manager of Mars Veterinary, describing Mars' marketing and sale of the its dog breed identification kit as a sub-licensee of the Fred Hutchinson patent as well as the impact that Defendants' product has had on their business. *See generally* Price Decl.

In response, Defendants, raise two arguments. First, Defendants allege that they are not infringing on the '863 patent in their current practices. Title 35 U.S.C. § 271 defines patent infringement stating, "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). This showing requires a party "to perform each and every step or element of a claimed method or product." *BMC Resources, Inc. v. Paymentech, L.P.,* 498 F.3d 1373, 1378 (Fed.Cir.2007) (citing *Warner–Jenkinson Co., Inc. v. Hilton Davis Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). Defendants contend that they are not currently infringing on the '863 patent because they are not performing all of the steps of claim 1 within

the United States. *See* Prel. Inj. Hr'g Tr. at 136:18–137:2, Mar. 11, 2011.

Specifically, Defendants argue that they are not performing step (c) of claim 1 in the United States.[1,2] Step (c) of claim 1 states "determining the contributions of canid populations to the test canid genome." Fretwell Decl. ¶¶ 11 and 29. In support of this argument, Defendants presented witness testimony from Ms. Ashley Burnett ("Ms. Burnett"), Senior Scientist at BioPet, who described BioPet's dog breed analysis. In her testimony, Ms. Burnett stated that a computer program contained on a computer located in Pet-Safe's China facility performs the step of determining contributions of breed populations to the test dog. Prel. Inj. Hr'g Tr. at 41:16–42:14.

In evaluating Defendants' argument of non-infringement, the Court places particular emphasis on the full analytical process described by Ms. Burnett. The witness testified to how the computer in China is run and operated. Specifically, Ms. Burnett described a process by which she extracts the DNA from the sample provided by the customer, assigns markers to the DNA (a process described as PCR), puts the PCR data on a DNA analyzer, runs it through a computer program to conduct the statistical analysis that determines the breed contribution, and extracts

---

1. In both the written documents and hearing transcript, the individual parts of the claims (e.g., claim 1) are referred to both as steps and elements (e.g., claim 1, step (a) or claim 1, element (a)). The Court notes this interchanging language for the sake of clarity.

2. Initially, Defendants argued that both steps (b) and (c) of claim 1 were not being performed. However, Defendants own witness rebutted the argument regarding step (b) by admitting that BioPet's initiation of a computer program by a person constitutes use. Prel. Inj. Hr'g Tr. at 56:20–56:24. Therefore, this

Court concludes that BioPet is "using" the computer program as indicated by step (b) of claim 1 which states,

> *using* a specifically programmed computer comprising an algorithm to compare the identity of one or both alleles for each of the set of markers determined to be present in the test canid genome to a database comprising a plurality of canid population profiles, wherein each canid population profile comprises genotype information for the set of markers in the canid population.

Fretwell Decl. ¶¶ 9 and 27 (emphasis added).

the results.[3] Prel. Inj. Hr'g Tr. at 46:2–46:17. Defendants emphasize the fact that the computer containing the statistical analysis step is currently located in China; however, Ms. Burnett specifically testified that she controls the computer in China by emailing the PCR data to the computer in China, remotely logging into the computer in China,[4] initiating the program that performs the analysis to determine the contributions of breed populations and emailing the data back to the Knoxville, TN facility so that she (or other BioPet employees) can upload the results and prepare the data to be delivered to the customer. Prel. Inj. Hr'g Tr. at 49:7–50:8. Given BioPet's continued control over every step of the process and the fact that the computer program in China can only conduct the analysis after being initiated and controlled by a BioPet employee in the United States, this Court finds that Defendants are, in fact, performing step (c) of claim 1 of the '863 patent in the United States. *See e.g., Centillion Data Sys., LLC v. Qwest Comm. Int'l, Inc.,* 631 F.3d 1279, 1284 (Fed.Cir.2011); *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1317 (Fed.Cir.2005) (using the same rationale explicated here to interpret the definition of "use" under 35 U.S.C. § 271(a) and holding that "to 'use' a system for the purposes infringement, a party must put the invention into service, i.e., control the system as a whole and obtain benefit from it"). Consequently, Defendants have not made a valid non-infringement argument and have failed to challenge Plaintiffs likelihood to succeed on the grounds of infringement.[5]

■ Second, Defendants challenge the validity of the '863 patent on the grounds that it was anticipated by prior art. Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 9–11. To show anticipation, Defendants must

3. The Court also notes that Defendants' use of the computer in China began the week of the hearing (i.e., after the Court's February 22, 2011 issuance of a TRO against PetSafe regarding its alleged infringement on the '863 Patent). Prior to the week of March 11, 2011, Ms. Burnett testified that the computer performing step (c) of claim 1 was located at a BioPet facility in Knoxville, Tennessee. Prel. Inj. Hr'g Tr. at 43:21–44:5 and 44:17–45:5.

4. In her testimony, Ms. Burnett indicated that she used a website called "myPC.com" that allows her to view the desktop of the computer in China and control it from the desktop of her computer in Knoxville, TN. Prel. Inj. Hr'g Tr. at 50:5–50:14.

5. Even if the Court found that Defendants' use of the China computer qualified as performing step (c) of Claim 1 in China, Defendants would still be liable for infringement under 35 U.S.C. § 271(g). Title 35 U.S.C. § 271(g) states (in relevant part),

Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale or use of the product occurs during the term of such process patent.

Congress specifically enacted this provision to provide process patent holders with a cause of action for infringement against parties that used the patented process abroad to create products and then imported, used or sold those products in the United States. *See Eli Lilly and Co. v. American Cyanamid Co.,* 82 F.3d 1568, 1571–72 (Fed.Cir.1996). Defendants argue that they are not infringing because they perform a step of the claim outside of the United States. However, in Ms. Burnett's testimony, she stated that BioPet obtains the breed contribution of the dog as an output from the computer program analysis and sends that output back to the Knoxville, TN facility via email. Prel. Inj. Hr'g Tr. at 49:7–50:8. Ms. Burnett then testified that BioPet uses this output to assign levels of contribution which is the final product sent to the customer. Prel. Inj. Hr'g Tr. at 46:18–46:22. Therefore, looking at the language of 35 U.S.C. § 271(g) as well as its legislative history, and reviewing Defendants process as stated on the record, the Court finds that Defendants still fail to assert a valid non-infringement claim.

present "testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference." *Koito Mfg. Co., Ltd. v. Turn–Key–Tech, LLC,* 381 F.3d 1142, 1152 (Fed.Cir.2004). In presenting this argument, Defendants offer as evidence a series of scientific articles, the declarations of Dr. Michael L. Baird ("Dr. Baird") and Dr. Mikko T. Koskinen ("Dr. Koskinen") and oral testimony from Dr. Baird. *See* Baird Decl. ¶¶ 4–16; Koskinen Decl. ¶¶ 3–5. Specifically, Defendants referred to roughly 18 articles; however, they mention only nine in the Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and discuss only three of the articles in their analysis.[6] In fact, Defendants' written discussion and declaratory testimony rely primarily on the argument that one specific article, "Individual Assignment Using Microsatellite DNA Reveals Unambiguous Breed Identification in the Domestic Dog," by M.T. Koskinen ("Koskinen article"), anticipates claim 1 of the '863 patent. Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 12–14.

According to the United States Court of Appeals for the Federal Circuit, an alleged infringer has raised substantial question of invalidity under the *Titan* standard if the movant cannot prove that the invalidity claim lacks substantial merit. *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1340 (Fed.Cir.2003) (quoting *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,* 279 F.3d 1357, 1365 (Fed.Cir. 2002)). Given Defendants' heavy reliance on the Koskinen article, the Court will address that article first and then discuss the other articles Defendants' use to establish their invalidity claim.

Contrary to Defendants assertions, Plaintiffs argue that the Koskinen article is not prior art because it was published less than one year before the patent's priority date and because Plaintiffs had "conceived and reduced the invention to practice before Koskinen was published." Reply in Supp. of Pls.' Mot. for Prelim. Inj. at 6; *See* 35 U.S.C. § 102(a) & (b) (stating that a patentee can show that an invalidity claim lacks substantial merit if the reference was published within a year of the patent date or if the invention was known or used prior to the application date of the patent or regarding a reference that was published within a year of the patent date).[7] Defendants do not refute Plaintiffs' factual assertion that Koskinen was published no earlier than July 22, 2003.[8] *Id.* As noted in the '863

---

**6.** Defendants present about 18 articles to the Court, while only specifically mentioning nine of them. *See generally* Def.'s Resp. in Opp. Mot. for TRO, Exs. 1–9; Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 10–15, Exs. 1–9 and 11–19. Similar to PetSafe's response to the Motion for TRO, Defendants focus only on three of the articles in their Reply in Opposition to Plaintiffs' Motion for Preliminary Injunction. *See* Defs.' Opp. to Pls.' Mot. for Prelim. Inj. 12–15.

**7.** 35 U.S.C. § 102 states (in relevant part):

A person shall be entitled to a patent unless (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on a sale in this country, more than one year prior to the date of the application for patent in the United States . . .

**8.** Plaintiffs base this date on a *PubMed* publication search. Second Decl. Fretwell ¶ 16. The Court also notes that in the version of the Koskinen article provided by Defendant PetSafe, the article itself indicates that it was *accepted* for publication on March 6, 2003. This fact indicates that the article was published at some point after that date (which is

patent itself, the priority date is December 17, 2003. Given these facts, this Court finds that the Koskinen article is not prior art under 35 U.S.C. § 102 because it was published less than one year prior to the '863 patent's priority date.

■ Even if the Koskinen article was not disqualified as prior art based on its publication date, the Court finds that it also does not qualify as prior art because the claimed invention had been conceived and reduced to practice before the cited reference. *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed.Cir.2001). Under *Purdue Pharma*, Plaintiffs can establish that a particular invention was conceived and used before a particular reference through declaratory testimony and supporting evidence. *Id.* at 1365. To this effect, Plaintiffs have presented evidence in the form of declarations from Dr. Elaine Ostrander, Dr. Heidi G. Parker, Dr. Leonid Kruglak and Dr. Neale Fretwell indicating that Claims 1 and 20 of the '863 Patent were reduced to practice at a scientific meeting in May 2003 (i.e., the Cold Spring Harbor Symposium). *See* Reply in Supp. of Pls.' Mot. for Prelim. Inj. at 7. The inventor declarations of Drs. Ostrander, Parker and Kruglak identified all of the limitations in claims 1 and 20 and discussed how each limitation was met by the information found in the poster presented at the

Cold Spring Harbor meeting in May 2003. *Id.; See* Ostrander/Parker Decl. at ¶¶ 7-19; Kruglak Decl. at ¶¶ 7-19. With the declarations were the inventors visual representations of the poster as well as the program that was distributed to the symposium participants. Meanwhile, Dr. Fretwell's second declaration confirmed the inventors' declarations by conducting a step by step comparison of claims 1 and 20 and the substantive material referenced on the presentation poster and in the program. Based on this analysis, Dr. Fretwell concluded that claims 1 and 20 were performed prior to the publication of the Koskinen article on July 22, 2003. *See* Fretwell Second Decl., ¶¶ 4, 7-16 and Ex. 2 (providing a claim chart for the '863 Patent and the 2003 Cold Spring Harbor Poster). After careful review of the documents and in light of the testimony provided through the declarations, the Court finds that the Koskinen article is not prior art and, therefore, Defendants' cannot use the article to prove their invalidity claim.

Defendants also assert that various other prior arts raise a substantial question of validity under the doctrines of anticipation and obviousness. Defendants rely primarily on the expert testimony of Dr. Baird and a claim chart (Defendant's Exhibit 2) offered in support of his findings to assert these claims.[9] In the hearing the Court conducted on March 11, 2011. Dr. Baird

---

also within one year of the '863 patent's priority date of December 17, 2003).

**9.** In Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, the parties discuss two additional articles as they relate to the elements of the '863 patent claims: Randi et al., *Detecting rare introgression of domestic genes into wild wolf (Canis lupus) populations by Bayesian admixture analyses of microsatellite variations* (2002); and Vila et al., *Combined use of maternal, paternal and biparental genetic markers for the identification of wolf-dog hybrids* (2003). In the claim chart

provided during Dr. Baird's testimony (marked as Defendant's exhibit 2 at the Mar. 11, 2011 hearing), Defendants' reference the following additional articles to argue that Claims 1, 20, 22, 28, 35, 36, 37 and 39 are invalid due to anticipation and/or obviousness: Wilton et al., *Microsatellite variations in the Australian dingo* (1999); Davies et al., *Determining the source of individuals: multilocus genotyping in nonequilibrium population genetics* (1999); and Rosenberg, Prichard et al., *Genetic Structure of Human Populations* (2002).

was qualified as an expert witness and testified that he had reviewed all of the articles Defendants mentioned and concluded that they disclosed the technology claimed in the '863 patent. Prel. Inj. Hr'g Tr. 61:5–64:8. Defendants also presented a claim chart to the Court in an attempt to meet the substantial question burden. Upon review of the analysis Dr. Baird conducted, the Court finds his testimony to be unhelpful, unpersuasive and incredible. As evidence by his testimony in open court, Dr. Baird did not know how to interpret patent claims to establish invalidity by prior art as outlined in *Koito Manufacturing Company, Ltd. v. Turn–Key–Tech.* Rather, he relied on Mr. Irion's (Defendants' counsel) articulation of the elements of the claim and presented an analysis to the Court that was prepared by and bore the imprint of Defendants' counsel. Prel. Inj. Hr'g Tr. 89:15–90:20 (stating, "this is an outcome of conversations, as Mr. Irion said, between himself and me about the prior art." Also describing the creation of the claim chart presented into evidence as follows: "[h]e sent me a draft copy. I made some corrections and sent it back to him, and then ultimately this is what we have today."). As admitted on the record, counsel defined the elements of the claim for the witness, prepared the first draft of the claim chart presented to the Court and submitted a finished product to the Court that simply bore the expert's input. The Court finds this to be suspect and weighs the credibility of Dr.

Baird's testimony in light of this questionable procedure.[10]

Even if the Court accepted Dr. Baird's testimony and the accompanying claim chart as the independent expert opinion of Dr. Baird, it nonetheless fails to raise a substantial question of validity because it does not address all of the elements of the claims (e.g., neither Vila nor Randi reference the breeds covered in Claims 22 and 28) and the chart findings are effectively rebutted by the Dr. Fretwell's detailed analysis of the articles in his second declaration. *See* Prel. Inj. Hr'g Tr. at 92:18–93:14 and 93:21–94:3; Fretwell Second Decl. ¶¶ 22–36. Furthermore, the Court weighs Dr. Baird's testimony with caution and skepticism in light of the fact that he has a financial business interest with Defendant, BioPet. Dr. Baird is the Chief Scientific Officer of DNA Diagnostics Center, which obtains its supply kits for DNA testing from BioPet. Prel. Inj. Hr'g Tr. at 87:13 and 94:22–95:14 (describing Dr. Baird's arrangement to testify "pro bono" and his employer's financial interest in BioPet as a reseller of its products). Therefore, Dr. Baird, as a member of the management team of DNA Diagnostics Center,[11] has an interest in the case because DNA Diagnostics Center would be adversely affected by a ruling against BioPet.[12]

In light of the fact that Defendants failed to present any credible or persuasive testimony by a person skilled in the art to support its allegations of invalidity and the

10. During the hearing for the TRO, the Court cautioned Mr. Irion, counsel for Defendants, about offering an affidavit from himself discussing whether the '863 patent was anticipated by prior art.

11. According to DNA Diagnostics Center's corporate website, Dr. Baird is a member of the "management team" and highly ranked within the company. *See* DNA Diagnostics

Center, Management Team page, *available at* http://www.dnacenter.com/management.html.

12. Defendants proffered throughout the proceeding that third party distributors would suffer a loss if this Court grants relief to Plaintiffs because the products that they have already ordered would be rendered worthless. *See* Prel. Inj. Hr'g Tr. at 35:15–22.

fact that the Koskinen article is not prior art under 35 U.S.C. § 102, this Court finds that Defendants have failed to raise a "substantial question of invalidity" as required by *Titan Tire Corporation v. Case New Holland, Inc.* Consequently, the Court concludes that the Defendants have not effectively challenged the presumption of validity of the '863 patent. Additionally, given the presumed validity of the '863 patent, Plaintiffs' allegations of infringement of claims 1, 20, 22 and 28 and Plaintiffs' sworn affidavits from skilled professionals in the art (including claim by claim analysis charts) to support the infringement allegations, the Court finds that Plaintiffs have established a likelihood of success on the merits, as required by *Winter*.

## B. Irreparable Harm

The Supreme Court of the United States has indicated that plaintiffs seeking preliminary relief must demonstrate that irreparable harm is likely in the absence of the requested relief. *Winter*, 129 S.Ct. at 375 (indicating that a movant for preliminary injunction must demonstrate more than a possibility of irreparable harm). Plaintiffs assert that they will suffer a permanent loss of customers and market share,[13] price erosion and a loss of goodwill and reputation in the absence of preliminary relief. Plaintiffs further assert that they will suffer price erosion because both BioPet and PetSafe have priced their products below that of Mars' products (e.g., $40–45 for PetSafe's DNA Breed Identification Test versus $85 for Mars' Wisdom Panel Insights test). Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. at 19; Price Decl. ¶ 15. Finally, Plaintiffs allege that they will suffer permanent loss of reputation if PetSafe is allowed to continue its activities absent preliminary relief because both BioPet and PetSafe's products are of lesser quality and have already been ill-received by customers in the market. *See* Price Decl. ¶¶ 27–31 and Ex. 9; Fretwell Decl. ¶¶ 46–47. In support of these assertions, Plaintiffs have submitted copies of internet blogs/social media sites expressing customer dissatisfaction with the BioPet product, declarations from two skilled professionals and a copy of the PetSafe pamphlet displaying pricing for its DNA Breed Identification kit. *See* Price Decl. Exs. 1, 7 and 9–12.

■■■ "When the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir.1994); *Merrill Lynch, Pierce, Fenner and Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir.1985). Defendants argue that there has been no loss of goodwill because they have a superior rather than inferior product. Defts.' Opp. to Pls.' Mot. for Prelim. Inj. at 21–22. Defendants argue that although their testing kit identifies less breeds, they do so "with extremely high levels of statistical confidence." *See* Burnett Decl. ¶¶ 8–9. Through both live and declaratory evidence, Defendants also argue that they have received complaints from less that 4% of their customers. *Id.* at ¶ 11. In evaluating this factor, the Court considers the evidence Plaintiffs and Defendants presented regarding loss of goodwill. Additionally, the Court considers Plaintiffs' unrebutted evidence of its

---

**13.** Plaintiffs argue, and Defendants do not rebut, that once a customer has purchased a DNA Breed Identification Kit from Defendants and tested a dog, there is no means of recapturing that customer (i.e., customers usually do not test dogs more than once). Decl. Price ¶ 22.

permanent loss of customers and price erosion. In light of the evidence presented, the Court concludes that Plaintiffs have established a likelihood of irreparable harm in the absence of preliminary relief.

## C. Balance of Equities

Plaintiffs must also establish that the "balance of equities tips in [their] favor." *Winter*, 129 S.Ct. at 376. Plaintiffs assert that the balance in equities tips in their favor because 1) PetSafe has not been in the market of selling dog DNA testing kits to veterinarian customers long; 2) Mars as a sublicensee is paying royalties for a product that PetSafe is infringing upon at no added cost; and 3) PetSafe has other products that could be marketed to potential customers. Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. at 23–25. Defendants assert that the balance of equities weighs in their favor because 1) BioPet is a small company and will likely go out of business, or go bankrupt, if enjoined from selling the DNA Identification Kits (Defts.' Opp. to Pls.' Mot. for Prelim. Inj. at 23; Simpson Decl. ¶ 3–4) and 2) both companies would suffer an estimated $6,000,000 in lost sales from the product, with PetSafe being forced to discontinue the entire product line (*see* Mainini Decl. ¶ 5–6; Tedford Decl. ¶ 5–6; Defts.' Opp. to Pls.' Mot. for Prelim. Inj. at 23–24).[14]

While this Court recognizes that it is appropriate to consider BioPet's small company size as a factor, the Court nonetheless must determine if the other prongs for injunctive relief have been established. *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708

(Fed.Cir.1997) (stating that the risk of being put out of business does not insulate a small company from the issuance of a preliminary injunction if the other factors are met). The Court has already found Plaintiffs were likely to succeed on the merits and will suffer irreparable harm. Defendants' harm does not offset the elements of irreparable harm to the Plaintiffs nor does it overcome the public interest in enforcing patent rights.[15] After considering the arguments of both parties, the balance of equities weighs in Plaintiffs' favor because Plaintiffs have an established reputation and history of offering the products to veterinarians that would be adversely impacted by Defendants' sale of a potentially lesser product; and Plaintiffs payment of royalties for the use of the product puts them at a competitive disadvantage. While BioPet may face bankruptcy or termination, this consideration does not outweigh Plaintiffs' harms nor does it offset the other factors involved in determining whether a preliminary injunction should be issued.

## D. Public Interest

Finally, Plaintiffs must establish that preliminary relief would be in the public interest. *Winter*, 129 S.Ct. at 376. Plaintiffs cite case law dating back 50 years, highlighting the strong public interest in preserving the rights of patent holders. Mem. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. at 25 (citing *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954) (discussing the underlying importance of patents to advancing the public welfare "through the talents of authors

14. Defendants also cite job loss in this analysis, specifically mentioning the eight BioPet employees that would be terminated and 20 additional employees that assist with the packaging of the product.

15. In announcing this finding on the record, the Court noted that PetSafe is a $300,000,000 business. Therefore, even if the Court assumed a $6,000,000 loss for that company alone, that loss would not be severely detrimental to PetSafe's overall business.

and inventors")). Defendants assert that the public interest weighs in their favor because injunctive relief would cause considerable damage to third parties not involved in the case. In support of this argument, Defendants offer testimonial evidence from three BioPet/PetSafe executives indicating that there are 18,615 kits that customers have purchased from BioPet but not yet processed for the results. *See e.g.,* Simpson Decl. ¶ 7. According to Defendants, this amounts to over $1,000,000 of damages to the public if they were to be enjoined from selling or processing the dog identification kits. *Id.* at ¶ 8; Mainini Decl. ¶ 8; Tedford Decl. ¶ 8. Additionally, Defendants state that PetSafe has shipped 1,808 kits to third-party distributors, representing a loss to those parties in the amount of $56,048 if those kits cannot be sold or processed. Mainini Decl. ¶ 7; Tedford Decl. ¶ 7. While Defendants have presented evidence indicating a potential harm to the public, this Court finds there is a strong public interest in preserving the rights of patent holders. The potential harms Defendants cite to third parties are harms that they are responsible for addressing through their business operations. Accordingly, the Court **FINDS** that the public interest weighs in favor of enforcing Plaintiff's patent.

## IV. CONCLUSION

For the reasons stated above and on the record, Plaintiffs' Motion for Preliminary Injunction is **GRANTED.** Plaintiffs' Motion for Preliminary Injunction is conditioned upon Plaintiffs' undertaking in the form of a bond, certified check, or cash in the amount of $450,000.00 no later than March 14, 2011, to secure the payment of such costs and damages not to exceed such sum as may be suffered or sustained by any party who is found to have been wrongfully enjoined hereby.

**IT IS SO ORDERED.**